UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF WISCONSIN
                         GREEN BAY DIVISION

--------------------------------------------------------------
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,  )  Case No. 25CR103
                                   )
     vs.                           )  Green Bay, Wisconsin
                                   )
RYAN SCHROEDER,                    )  October 20, 2025
                                   )
                    Defendant.  )  1:37 p.m.
                                   )
--------------------------------------------------------------

                   TRANSCRIPT OF EVIDENTIARY HEARING
                BEFORE THE HONORABLE BYRON B. CONWAY
                    UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:    United States Dept of Justice
                             (ED-WI)
                             By:  MESSRS. DANIEL R. HUMBLE
                             and TIMOTHY FUNNELL
                             Office of the US Attorney
                             205 Doty Street
                             Suite 301
                             Green Bay, Wisconsin 54301
                             Ph:  920-884-1066
                             Daniel.Humble@usdoj.gov
                             Tim.Funnell@usdoj.gov

For the Defendant            Gimbel Reilly Guerin & Brown, LLP
                             By:  MR. JASON D. LUCZAK
(Present)                    330 East Kilbourn Avenue
                             Suite 1170
                             Milwaukee, Wisconsin 53202
                             Ph:  414-271-1440
                             jluczak@grgblaw.com

U.S. Official Court Reporter:  THOMAS A. MALKIEWICZ, RMR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer aided transcription.

TRANSCRIPT ORDERS:  Thomas_Malkiewicz@wied.uscourts.gov

1

                         I N D E X

WITNESS                  EXAMINATION                  PAGE

JAMES BROOKS             Direct by Mr. Funnell           8

                         Cross by Luczak                30

                         Redirect by Mr. Funnell        46

CORY ERLANDSON          Direct by Mr. Humble            48

                         Cross by Luczak                52

NATHANIEL STEBER         Direct by Mr. Humble           57

                         Cross by Luczak                82

                         By the Court                  100

                       E X H I B I T S

EXHIBIT NO.                                          REC'D

1 through 11, 12-A, and 13 through 17                   5

101 through 103                                         7

**REPORTER'S NOTE:** Per stipulation of court and counsel, any minors' names mentioned during the hearing were changed in the transcript to use initials only.

Case 1:25-cr-00103-BBC    Filed 10/24/25    Page 2 of 106    Document 18

TRANSCRIPT OF PROCEEDINGS

THE CLERK:  The court calls case number 25-CR-103, United States of America versus Brian S. Schroeder, for an evidentiary hearing.  May we have appearances, please?

MR. HUMBLE:  Dan Humble and Tim Funnell for the Government.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. LUCZAK:  Good afternoon, Your Honor.  Jason Luczak from Gimbel, Reilly, Guerin & Brown appears with Ryan Schroeder, who appears in custody in person.

THE COURT:  Thank you.  So, first, let me just say that working on what I hope is the back end of a cold that robbed my voice over the weekend, so I apologize for that.  I think we'll be able to get through it where everybody can hear me.

This is the --  We're here for the defendant's motion to suppress, and I believe it was their request to have this evidentiary hearing.  Are you both prepared to proceed today?

MR. HUMBLE:  Yes.

MR. LUCZAK:  Yes, Your Honor.

THE COURT:  Have you guys discussed a plan of how this is going to proceed, who's going to go first?

MR. HUMBLE:  Yes, Judge, I believe we will -- the Government will go first.

THE COURT:  Okay.  And how many witnesses do you

3

have?

MR. HUMBLE: We have three.

THE COURT: All right. Any other witnesses besides the three that you guys are calling?

MR. LUCZAK: From the defense?

THE COURT: Yeah.

MR. LUCZAK: We may call Mr. Schroeder.

THE COURT: Okay. Well, we'll see how that goes. Then are you guys prepared to proceed?

MR. HUMBLE: Yes, Judge, maybe just a little housekeeping.

THE COURT: Sure.

MR. HUMBLE: We provided to, by agreement of the parties, we provided to the Court exhibits -- I think you have a binder in front of you?

THE COURT: Yes.

MR. HUMBLE: Exhibits 1 through 5, which would be the two conversations with the school and the three conversations back at the sheriff's office.

THE COURT: I was told today, the first I'd heard of it, that -- I've seen all the videos, I've watched everything. I did not, though, have provided to me video from -- It's my understanding there's video of the interview at the school, which I only heard audio of. Is that --

MR. HUMBLE: I was just going to get to that, Judge.

4

THE COURT: Okay.

MR. HUMBLE: That is correct, by the way, and the reason for that is that subsequent to meeting with Detective Brooks, we were able to get the body cam video, but that was after we had submitted the first batch of video, so we will play that here today, but we will provide the Court with a copy of the full videos.

It's my understanding after speaking with defense counsel, Exhibits No. 1 through 17 are agreed to and stipulated they may be received into evidence.

(Exhibit Nos. 1-11, 12-A, and 13-17 were admitted into evidence per stipulation of the parties.)

MR. LUCZAK: That's right, Your Honor. And just a little further housekeeping, we have agreed to brief this after this hearing, so as far as we're trying to expedite this hearing for you so we won't belabor things that are already entered into, but are on video that, you know, you can see for your own eyes.

THE COURT: Yeah, and I was going to mention that too, depending on how things proceeded here, again, I viewed it all, so it would be overkill, but I'll let you guys decide what you want to do with the videos here today. And, right, the plan was to take all this under advisement and issue a written decision at a later date.

MR. LUCZAK: Yeah.

THE COURT: Okay.

MR. FUNNELL: Your Honor, the binder that you have in front of you, I believe the first page has exhibits listed one through 17; is that right?

THE COURT: It is.

MR. FUNNELL: So the parties have agreed as indicated to admit all of those. I would say with regard to Exhibit 12, I believe you also have a 12-A.

THE COURT: In the binder?

MR. FUNNELL: Yes.

THE COURT: Yes, I see that.

MR. FUNNELL: That is two pages from Exhibit 12, so I don't think we need or want to introduce the entire Exhibit 12 because there's a number of pages that have people's phone numbers and addresses and that sort of thing. 12-A is strictly two pages of Detective Brooks' report, and then we redacted the name of the student, we'll just refer to her here today as G.K., so rather than admit 12, I would suggest that we simply admit 12-A.

THE COURT: Mr. Luczak?

MR. LUCZAK: Yeah, that's fine.

MR. FUNNELL: And then Exhibits 6, 7, and 8 are the body cam videos that the Court has not seen yet. Detective Brooks is prepared to testify today just to provide some context, so we won't watch all of the videos. Six and eight

we're just going to watch portions. Seven is only a couple minutes, so we'll probably end up watching that whole thing.

And as the Court indicated, you've already had the audio. The audio is the entire interview with the school with Mr. Schroeder in the conference room. Six, seven, and eight shows parts of it because Detective Brooks was in and out of the room, so he was the one with the body cam, and so I just wanted to sort of for clarification and to put things into context just have him testify as to what the circumstances were as why he was coming in and out and that sort of thing.

THE COURT: Okay. Six -- Six, seven, and eight?

MR. HUMBLE: Yes, Your Honor.

THE COURT: Okay. Okay. Anything else, Mr. Luczak?

MR. LUCZAK: Yeah, just one more thing while we're talking about exhibits. I have marked Exhibit 101, 102, and 103. These are all the search warrants and the affidavits for the search warrants, so I will be getting into those. I don't know if -- I just did not discuss this with the Government. I don't know if they have any objection to us receiving those.

THE COURT: Okay.

MR. FUNNELL: No.

THE COURT: No objection.

MR. LUCZAK: Okay. Thanks.

(Exhibit Nos. 101, 102, and 103 were admitted into evidence per stipulation of the parties.)

7

THE COURT: So then it sounds like aside from 12, everything else is agreed -- can be received?

MR. FUNNELL: Yes, Your Honor.

THE COURT: With no objection from either party.

MR. LUCZAK: Yes, and I discussed that with my client, and he's in agreement.

THE COURT: Okay. Before we get started, just give me one second.

(There was discussion off the record.)

THE COURT: Okay. Sorry about that.

MR. FUNNELL: The Government calls James Brooks.

THE CLERK: Raise your right hand.

JAMES BROOKS, called as a witness herein, after having been first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE CLERK: You may be seated.

MR. LUCZAK: Judge, I'm sorry to interrupt, I want to make sure the witnesses are excluded from the courtroom. I think they are, but --

THE COURT: Are we agreed on that?

MR. HUMBLE: Yes.

MR. FUNNELL: Yes, Your Honor.

THE CLERK: Please state and spell your first and last name for the record.

8

THE WITNESS: James Brooks, B-R-O-O-K-S.

DIRECT EXAMINATION

BY MR. FUNNELL:

Q.  Mr. Brooks, where do you work?

A.  I'm employed as a detective with the Mishicot Police Department.

Q.  And how long have you been with Mishicot?

A.  Over four years.

Q.  I'm going to ask you to just to pull the microphone down just a little bit closer.  Make sure the court reporter can get everything.

In front of you is a binder.  Do you see that?

A.  I do.

Q.  Can you open that to Exhibit 12-A, please?

A.  I've got it.

Q.  All right.  This has already been admitted, but do you recognize Exhibit 12-A?

A.  It's my report with some redactions.

Q.  A report from what incident?

A.  An incident that Ryan Schroeder was investigated for inappropriate and nude photographs being sent online with a seventh grade student who was 13 years old.

Q.  All right.  We're not going to go through the entire Exhibit 12-A, because it's already in the record, but I just want to ask you some questions about your investigation, and

9

then I want to play some body cam videos that I believe you took on the day of this investigation. So the report talks about when you responded to Mishicot High School, do you remember what date that was?

A. I believe it was April 16th, 2025.

Q. All right. And you received a call when you were at the police department?

A. I was at lunch and I received a phone call from my chief that asked me to go to the school and help them with an incident they had going on.

Q. And did you go over to the school?

A. I did.

Q. You got the call, it says here about 1:08 p.m.; is that right?

A. Correct.

Q. And what time did you get to the school?

A. 1:20.

Q. Can you describe for us this school complex? It's described in your report as Mishicot High School. Is it both high school and middle school?

A. Yes, the high school is attached to the middle school also.

Q. All right. So when you get to the high school, how is it that you entered that day?

A. I went through the front doors, and I then went into the

administrative secretary area where I used my key fob to gain access to, and I was met with school staff there.

Q. Now, later on during this investigation, did you and Detective Steber meet with Mr. Schroeder in an interview room there?

A. We met with him in the district conference room.

Q. Is that conference room part of sort of the office complex when you first entered and were describing?

A. No.

Q. Where is that conference room relative to those offices that you went in initially?

A. If you would enter inside of the school, and then you would go to the right, you would walk down the hallway a little bit, and then you would see a sign for district offices. That conference room is attached to those offices, which are separate from the high school and middle school offices.

Q. So when you went there initially, you didn't go to that conference room, you went to the high school offices; is that right?

A. Correct.

Q. And at the time you went there, did you have any substantive information about why you were going there?

A. No.

Q. What did you know?

A. I was told that CPS might be getting involved.

Q. CPS meaning what?

A. Child Protective Services.

Q. But you didn't know the nature of the complaint?

A. No.

Q. Did you know the names of anybody involved?

A. No.

Q. So when you had went there, did you get that information from somebody at the school?

A. I did.

Q. Who did you get that information from?

A. I met collectively with superintendent Cory Erlandson, high school and middle school principal Justin Gerlach, the assistant principal, Sara Greenwood, and the athletic director, Nicole Schmidt.

Q. For the court reporter, Cory Erlandson is, correct me if I'm wrong, C-O-R-Y, E-R-L-A-N-D-S-O-N?

A. Correct.

Q. And Justin Gerlach, G-E-R-L-A-C-H?

A. Correct.

Q. Then I believe you said Sara Greenwood, that's S-A-R-A?

A. That's what I have.

Q. And then Nicole Schmidt-Leroy?

A. Correct.

Q. Okay. What are their roles at the school?

A. Erlandson is the superintendent, Gerlach is the principal,

12

Greenwood is the assistant principal, and Schmidt-Leroy is the athletic director.

Q.   Do they have those roles for both the high school and middle school?

A.   Yes.

Q.   Did you find out who you were going to be interviewing?

A.   I did.

Q.   And who was that?

A.   G.K.

Q.   How old was, we'll just call her G.K., how old was G.K.?

A.   Thirteen years old and in seventh grade.

Q.   Before you met with G.K., did you get information from those administrators that you've identified?

A.   I did.

Q.   And is that --  Well, strike that.  Did they explain to you that they had interviewed her?

A.   Yes.

Q.   Based on that interview, did they give you a timeline that you were sort of working with in this investigation?

A.   They told me based upon their conversations prior in the day that Schroeder was going to be put on administrative leave at 3:00 p.m.

Q.   Okay.  So you hadn't met with him yet, you didn't know who he was; is that right?

A.   No.  I had heard the name, but I don't believe I ever met

him in person.

Q. And they described him as having what role at the school?

A. For G.K., he was her adviser and gym teacher. I believe he was also the track and cross-country coach.

Q. All right. So by the time you got done talking with the administrators, what time was that?

A. G.K. was brought up that I started speaking with her at, I believe, 1:55.

Q. All right. So from the time you got there you had spent roughly a half an hour then with the administrative staff?

A. Correct.

Q. And then they had told you at 3:00 o'clock Mr. Schroeder was going to be suspended?

A. Or at least put on administrative leave.

Q. That timeline, did that cause you to ask for assistance?

A. It did. I contacted Lieutenant Brett Oswald with the Manitowoc County Sheriff's Office and asked if they could have at least one more detective come up to the school and help me with interviews.

Q. So during this time that you were then going to be meeting with G.K., were you doing sort of multiple tasks, trying to do multiple tasks at once?

A. I was.

Q. And what was that?

A. I believe I had spoke with G.K.'s mom over the phone, I

14

had spoke with Lieutenant Oswald over the phone, and I had spoke with ADA Scarpelli over the phone.

Q.    The report, Exhibit 12-A, it has details of what G.K. told you about her interactions with Mr. Schroeder over text message and Instagram; is that correct?

A.    Correct.

Q.    Including the pictures and/or videos that were exchanged?

A.    Correct.

Q.    Does 12-A accurately talk about those things?

A.    Yes.  She said they had started communicating over text message, but there was concerns they would get caught talking because her -- her step mom monitors her phone, and so they -- Schroeder had talked to her and said that they should go to Instagram, G.K. had an Instagram account, and doing that he asked her what she had him saved in her contacts as, and she said Emma.

At that time she said Schroeder created an Instagram account that didn't have any pictures or any information with it, but that the account was Emma, E-M-M-A, 7853268, which she also showed me that account on her phone.

Q.    All right.  So as you're speaking with Emma, she's showing you her phone?  Or not with Emma, excuse me, with G.K.?

A.    Yes.  G.K. did show me her phone.

Q.    All right.  Was she able to show you actual messages between herself and Mr. Schroeder?

A.   No, she said she had deleted everything about two weeks prior.

Q.   Same thing with any pictures or videos, was G.K. able to show you anything like that?

A.   No.

Q.   So the descriptions of what Mr. Schroeder had sent to her, those are contained within Exhibit 12-A, that's what G.K. told you?

A.   Correct.

Q.   Am I correct that your interview at the school with G.K. was finished before you joined Detective Steber and Mr. Schroeder in the conference room?

A.   Correct.

Q.   Your report references a forensic interview that was going to be done with G.K., right?

A.   Yes.

Q.   Was that going to be that same day?

A.   Yes.

Q.   Did you at some point have to leave the school to go directly to that forensic interview?

A.   I did.

Q.   And was that as the interview with Mr. Schroeder was wrapping up?

A.   Yes.

Q.   Let's talk about your body cam.  You were wearing one that

16

day?

A. I was.

Q. Did you activate that continuously during your interaction with school staff and G.K. and Mr. Schroeder?

A. Yes, the only time I turned it off is if I went to go make a phone call.

Q. All right. So the interaction that you had with the administrators and G.K. is on your body cam?

A. Yes.

Q. And then when you participated in the interview with Mr. Schroeder, you were, fair to say, in and out of the room with -- with Mr. Schroeder and Detective Steber?

A. Yes.

Q. So you weren't in there continuously as Detective Steber was talking to him?

A. No.

MR. FUNNELL: Your Honor, what we'll do with the Court's permission is start with Exhibit 6, and I'll just have the witness describe those portions of Exhibit 6 that are relevant. And if I don't play six, seven, and eight in their completion today, certainly the Court can at its convenience do that in chambers, but so I just want to do this as expeditiously as possible. So I'll start with Exhibit 6, and we can play it up there. It starts at roughly 2:59 p.m., and we'll play it for a minute or two, and then I'll ask

17

Miss Stortz to fast forward it to a particular time.

MR. HUMBLE: Judge, traditionally we kill the lights back here if that's okay with you?

MR. FUNNELL: I don't know if you can see it from up there. Can you see it?

THE WITNESS: Yeah, I can see it.

MR. FUNNELL: Okay.

BY MR. FUNNELL:

Q. Now, before we start it, what we're looking at here, looks like a school hallway, right?

A. Correct.

Q. Can you describe where this is for us, please?

A. This is in the high school where I said before where you would walk into the front doors, and then if you went to the district offices, you would have to go to the right. This is us walking down that hallway to the district offices.

Q. And when you say us, who is us?

A. Myself and Detective Steber.

Q. And where are you going?

A. To the district conference room.

Q. To meet with?

A. Mr. Schroeder.

Q. As we're going to play this, and you walk into the room, is that the first time that you and Detective Steber met Mr. Schroeder?

A.   Yes.

Q.   All right.  Why don't we go ahead and play Exhibit 6.

(The video was played.)

BY MR. FUNNELL:

Q.   I want to ask her to stop it at that point at 15:01 and 50 seconds, and going to ask her to forward it to 15:14.  Now, before she starts playing it, let me just ask you, we fast forwarded through this, and it appears that you continue to stand in the same spot in the room.

A.   Yes.

Q.   Did you participate actively in the interview?

A.   No.

Q.   At some point did you leave the room?

A.   I did.

Q.   Were you asked to leave the room?

A.   Mr. Schroeder asked me if I could step out for a quick second, and I did that.

Q.   All right.  Why don't we go ahead and play that.

(The video was played.)

BY MR. FUNNELL:

Q.   Okay.  So that's the end of Exhibit 6, and it looks like you walked out into the hallway; is that right?

A.   That's right.

Q.   When Detective Steber asked you to update his boss, did you know who that meant?

19

A.   It meant Brett Oswald.

Q.   And why is it again that you were in contact with Lieutenant Oswald?

A.   I had asked for assistance for someone to help me come interview while I was still trying to get a forensic interview scheduled and for G.K.'s mom to arrive at the school.

Q.   And was Lieutenant Oswald taking an active role in the investigation while you and Detective Steber were at the school?

A.   Yes.

Q.   What was he doing?  What was detective -- or Lieutenant Oswald doing?

A.   We were compiling information and forwarding it to him, and at that time I believe he was applying for a search warrant for Schroeder's house.

Q.   So you were using the information that you had obtained in -- that's reflected in Exhibit 12-A?

A.   Yes.

Q.   For the search warrant?

A.   Yes.

Q.   And then was Lieutenant Oswald also interested in information that you were getting from Mr. Schroeder to include potentially in that search warrant?

A.   Yes.

Q.   All right.  The next exhibit that we'll play is Exhibit 7,

and we'll start that from the beginning, and I believe this is just a couple minutes later after you had left the room in Exhibit 6 and you walked back in.  Is that correct?

A.    Yes.

Q.    All right.  Why don't we go ahead and play that.

(The video was played.)

BY MR. FUNNELL:

Q.    Okay.  We just played the entirety of Exhibit 7.  I just have a couple questions about that.  At about 3:19 or so, it looks like you direct a question to Detective Steber of saying that you had talked to his boss; is that right?

A.    Yes.

Q.    Does that mean that you had talked to Lieutenant Oswald?

A.    Yes.

Q.    And then you asked Detective Steber a question about CSAM, is there CSAM?

A.    Yes.

Q.    What is CSAM?

A.    Child sexual assault material.

Q.    And you were asking him that question for what purpose?

A.    For purposes of obtaining search warrants and -- for the house, and then we were also -- we had also seized a phone, and that would solidify probable cause for a warrant for the phone.

Q.    All right.  And were you going to relay that information to Lieutenant Oswald?

A. Yes.

Q. It sounded like, correct me if I'm wrong, that Detective Steber answered your question, is there CSAM, affirmatively, he said that there was?

A. Yes.

Q. And then did you ask him if he had viewed it?

A. I did.

Q. And what did he say?

A. No.

Q. I think his answer was something like not yet; is that right?

A. Yes.

Q. And then at that point you got a call?

A. Yes.

Q. Who was that call from?

A. Lieutenant Oswald.

Q. And we can sort of hear Lieutenant Oswald at the tail end there asking about what admissions there had been; am I right about that?

A. Yes.

Q. Did you step out then to continue talking to Lieutenant Oswald?

A. I did.

Q. All right. So when you left the room that time, you were able to give Lieutenant Oswald confirmation that there was CSAM

22

on the phone but not because Detective Steber had viewed it, because there had been an admission to it; is that fair to say?

A.   That's what I would assume, yes.

Q.   Okay.  Then if we could play Exhibit 8, and you're going to be walking back into the room at about 3:20.

(The video was played.)

BY MR. FUNNELL:

Q.   Pause it there.  We just paused it at 15:20, and it looks like again you're standing in the same spot that you were before?

A.   Yes.

Q.   I'd like to forward to 15:24, because there's some discussion here about a code, all right?

(The video was played.)

BY MR. FUNNELL:

Q.   If we could pause it there.  Sounded like Detective Steber was asking for the pass code for Mr. Schroeder's phone; is that accurate?

A.   Yes.

Q.   And he got it at that point, 0420?

A.   Yes.

Q.   All right.  If we could keep playing it then.

(The video was played.)

BY MR. FUNNELL:

Q.   Can we pause it there, please?  So at 15:24 your phone

rings again; is that right?

A.   Yes.

Q.   Who was that?

A.   I was on the phone with several different people, so I'm not exactly for sure which that one was.

Q.   But you had to step out to take it?

A.   Yes.

Q.   Okay.  And then you go back in?

A.   Yes.

Q.   Okay.  If we could keep playing that, please.

          (The video was played.)

BY MR. FUNNELL:

Q.   All right.  If we could pause it there.  Having heard some of that conversation now, do you recall who that was that you were talking to?

A.   That would've been G.K.'s mom.

Q.   You were coordinating with her for the forensic interview to take place later?

A.   Yes.

Q.   Okay.  We can keep playing it.

          (The video was played.)

BY MR. FUNNELL:

Q.   If we can pause it there.  It sounded like there was some discussion about where other pictures may be.  We paused it at 15:26, and Mr. Schroeder indicated My Eyes and Snapchat.  Did

24

you see that?

A.   I did.

Q.   And then did he provide another code to Detective Steber?

A.   Yes.

Q.   That was for the Snapchat or My Eyes?

A.   Yes.

Q.   Okay.  Why don't we keep playing it at 15:26.

(The video was played.)

BY MR. FUNNELL:

Q.   Okay.  If we could pause it there at 15:23 -- 25.
Detective Steber has left the room now; is that right?

A.   Yes.

Q.   He asked if you could stay there?

A.   Yes.

Q.   Did you at this point, up to this point, did -- did you or
anybody else ever handcuff Mr. Schroeder?

A.   No.

Q.   To your knowledge in your presence did anybody ever tell
him he was under arrest?

A.   No.

Q.   That he was detained in any way?

A.   No.

Q.   When you were standing there at the door where the body
cam is, I believe that there's a door behind you; is that
right?

25

A.    Behind and to the side.

Q.    Okay.  And then as we're looking at Mr. Schroeder across the table, there's another door?

A.    Correct.

Q.    Looks like just a sort of garden variety conference room?

A.    Yes.

Q.    With two different entrances and exits?

A.    Yes.

Q.    Are there students and staff that are able just to walk by in the hallway right outside?

A.    Yes.

Q.    And during the interview, were there indeed -- was there some of that traffic going on?

A.    Yes, I believe you could see some people on my body cam.  You can also hear them in the background.

Q.    Now, at this point when you were asked to stay in the room, did you actively interview Mr. Schroeder or ask him any questions?

A.    No.

Q.    We're going to keep playing this, and at some point he asks you some questions; is that right?

A.    Correct.

Q.    Why don't we go ahead and play that.

          (The video was played.)

26

BY MR. FUNNELL:

Q. Okay. If we could pause it there at 15:31:12. We just heard the exchange between Mr. Schroeder and you. Other than that exchange, fair to say that's the only time that the two of you had, like, the verbal interaction that day?

A. Yes.

Q. I'm going to ask Miss Stortz to forward it in a second to about another, well, it would be about 17 minutes 40 seconds into the interview. Am I correct that after this exchange, you just continued to stand there and it was pretty much just silence between the two of you?

A. Yes.

Q. Up until the point where Detective Steber reenters the room?

A. Yes.

Q. Okay. Why don't we go ahead and play that. We're starting again at 15:38.

(The video was played.)

BY MR. FUNNELL:

Q. Can you pause there for a moment? Okay. Detective Steber walked back into the room with a couple uniformed officers; is that right?

A. Yes.

Q. Did you know that those uniformed officers were coming?

A. I don't remember if I knew if they were coming or not.

27

Q.   You didn't call them?

A.   No.

Q.   Okay.  Detective Steber comes in and he starts giving some information, and then I believe Mr. Schroeder asked to close the door; is that right?

A.   If he did, I didn't hear it in the video.  I apologize.

Q.   Somebody asked to close the door; is that right?

A.   Yes.

Q.   And then it looks like are you walking out again?

A.   Yes.

Q.   Where are you going?

A.   I went and met with G.K. and her mom, and then escorted them down to the forensic interview in Saukville.

Q.   All right.  Did you have any further interaction with Mr. Schroeder that day?

A.   No.

Q.   So the events that happened down at the station, you didn't take part in that?

A.   No.

Q.   You were busy doing the forensic interview?

A.   Yes.

Q.   Let's --  Let's back up to during the investigation when you're kind of getting information and relaying it to Lieutenant Oswald.  Was the D.A.'s Office also part of those communications?

28

A.   Yes.

Q.   And specifically was one of the prosecutors instructing you about when and if Mr. Schroeder could be taken into custody?

A.   I spoke with ADA Scarpelli over the phone, and she said not to take Schroeder into custody until after a forensic interview had been completed.

Q.   All right.  Was that before Detective Steber was able to get admissions from Mr. Schroeder during the interview?

A.   Yes.

Q.   So the directive from the D.A.'s Office for you and Detective Steber going into the interview with Mr. Schroeder was not to take him into custody until after G.K.'s forensic interview?

A.   Correct.

Q.   And what time did G.K.'s forensic interview end?

A.   I don't know the exact time, but I would say it was probably after 7:00 o'clock that night.

Q.   All right.  But obviously he did, as we can see there, when the uniformed officers get there, he did get taken into custody, so circumstances changed; is that right?

A.   Correct.

Q.   You had learned information from Mr. Schroeder that hadn't yet been communicated to the D.A.'s Office?

A.   Correct.

29

Q.   So the decision was made at that point to take him into custody?

A.   That would've been between Detective Steber and Lieutenant Oswald.

Q.   Okay.

MR. FUNNELL:  Thank you.  No further questions.

MR. LUCZAK:  Thank you.

CROSS-EXAMINATION

BY MR. LUCZAK:

Q.   So would you agree with me that whatever the assistant district attorney told you did not control your determination of when to, you know, technically arrest Mr. Schroeder, correct?

A.   I had to act upon what my assistant district attorneys told me to do with regards to an arrest like this.

Q.   But you didn't clear arresting him and, I mean, a technically arrest Mr. Schroeder before you actually did it, you didn't call her again and ask for her permission, correct?

A.   I -- I did not speak with her over the phone, no.

Q.   Right.  And that was a call that you made, not a call that the D.A.'s Office made, right?

A.   I didn't take Mr. Schroeder into custody or have any portion of that.

Q.   Okay.  Well, let's talk about that issue of custody.  So when we're talking about custody, do you understand that we're

30

talking about whether someone in that person's position would feel free to leave? Do you understand that that's the definition that we're using?

A.  Yes.

Q.  Okay. And so by the time you made first contact with Mr. Schroeder, he was in a conference room, correct?

A.  Correct.

Q.  And the first thing that Detective Steber did, he took a very aggressive approach, didn't he?

A.  I would not call that aggressive whatsoever.

Q.  He said, "Give me your phone"?

A.  We were going to seize the phone.

Q.  Right. You were going to seize the phone because you at that point already had probable cause to arrest Mr. Schroeder, correct?

A.  No.

Q.  Okay. So your testimony today is that at that point when he said, "Give me your phone", because you have probable cause to seize the phone, that at that point you don't have probable cause to arrest Mr. Schroeder?

A.  ADA Scarpelli told us not to arrest him without a forensic interview.

Q.  And you did that anyways, correct?

A.  I did not.

Q.  He was arrested before the forensic interview was

completed, correct?

A.   You would have to talk to Detective Steber.  I did not control that arrest -- to anyone being taken to someone else for another interview.

Q.   Okay.  So you just testified earlier that at 7:00 p.m., the forensic interview is completed, correct?

A.   Some time around there.

Q.   Okay.  And we just saw the officers walk in after you were manning the room when Detective Steber stepped out, correct?

A.   Correct.

Q.   And what time was that?

A.   I think it was, if I -- 3:29, somewhere around there.

Q.   And it was at that point that cuffs were put on him and he was taken away from the school, correct?

A.   I never saw Mr. Schroeder be handcuffed.

Q.   Okay.  That's not my question.  Do you know, are you aware if at that point when the two officers walked in if he was arrested?

A.   I would not know that.

Q.   Okay.  I mean, you've reviewed the police reports in preparation for your testimony today, correct?

A.   I reviewed my report.  I didn't review Detective Steber's.

Q.   Okay.  So you believe that when those officers came in that they just let Mr. Schroeder walk out of the school and go home?

32

A.   I'm not for sure what they did.

Q.   Okay.  Now, you'd agree with me that a phone, if I took your phone, you -- let's say I directed at you, "give me your phone", and I take it, "I'm going to get it anyways", you -- do you think that that would be aggressive to do that?  Immediately, the first time I meet you?

A.   There would be more to go into it.

Q.   What more?

A.   Body language, environment.

Q.   Okay.  So let's talk about the environment.  At the point in time whenever Detective Steber and yourself walked in the room, Mr. Schroeder was never left alone again, correct?

A.   No.

Q.   Did you have your weapon on you and visible?

A.   Yes.

Q.   Did Detective Steber have his weapon on him and visible?

A.   I would assume so.  Unless it was covered up by a jacket.

Q.   And you agree with me that whenever you walked into that room, that at that point Mr. Schroeder was not going to be walking out of that room on his own volition, correct?

A.   Not at all.

Q.   Okay.  So you had previously developed information that you believe gave probable cause to seize a phone, yet you're not willing to testify today that at that point in time if Mr. Schroeder immediately said, you know what, I'm going to

leave here, that you would've just let him walk out the door?

A.   If we would've had the phone, he would've been -- he could've left, yes.

Q.   Okay.  And you also took the iWatch, correct, Detective Steber did?

A.   Yes.

Q.   And you would agree with me that when a phone is taken, that it would give the impression to someone that they're not free to leave?

A.   No.

Q.   Why not?

A.   Because they never conveyed if -- they never asked if they could leave or never showed a desire to leave.  Never even stood up.

Q.   Right.  Because the directive was very commanding, correct, Detective Steber was trying to give the impression to Mr. Schroeder that he was in control and he was going to get answers to these questions, correct?

A.   No.

Q.   Okay.  You saw the video?

A.   Yes.

Q.   Do you think that Detective Steber's tone was one just asking questions, you know, I want to find out what happened here.  Was that his tone?

A.   I would say it was a conversational tone between the two.

34

Q.   So would he -- when he first makes contact with him, Detective Steber, you heard him say, "We got to talk", correct?

A.   Yes.

Q.   He wasn't told he had the ability to not talk to Detective Steber, correct?

A.   Correct.

Q.   And he immediately said, "What would prompt you talking to a detective at the sheriff's office and Mr. Brooks with Mishicot P.D.," that's what he said, correct?

A.   Correct.

Q.   That seemed to indicate that he had information at that point that was incriminating, correct?

A.   Could be.

Q.   Could be or is?

A.   It would depend on what information he divulged.

Q.   No.  I'm talking about Steber before he even gets any information from Mr. Schroeder, he says to him, "What would prompt you talking to a detective at the sheriff's department?" That's what I'm talking about.  Before he has any information, he's trying to convey to him that he has incriminating information against Mr. Schroeder, correct?

A.   I can't speak for what Detective Steber said.

Q.   Well, you have a lot of training and experience -- I'm sorry, I don't mean to cut you off.  Go ahead.

A.   I don't know the meaning and everything for how he was

35

doing the interview or what information he was -- or the questions being asked.  I can't speak for him on that.

Q.   Okay.  And you were there whenever he said, "Why would you need to speak to law enforcement?"  He said, "I think you do know," correct?

A.   Correct.

Q.   And he asked, I mean, you were only in the interview for a period of time, but you would agree with me that the questions were meant to elicit incriminating information, correct?

A.   He was asking questions and getting responses.  If those responses were incriminating, then they were.

Q.   So you're not willing to say that -- that the goal of your interview or Detective Steber's interview was to elicit incriminating information?

A.   If there was incriminating information and he gave that response, then that was part of the investigation.

Q.   Right.  And what were you investigating?

A.   Child enticement.

Q.   And did you know that when you were dispatched to the school?

A.   No.

Q.   So you were just dispatched to the school for no reason?

A.   I was told over the phone by my chief I need to go to the school and help them out with a situation that they may have to call Child Protective Services.

36

Q.   Okay.

A.   That was the totality of the information I was given.

Q.   But you didn't say -- you didn't inquire about the nature of what you were walking into?

A.   I was never provided any other information.

Q.   You didn't even ask the question why?  Why am I being sent there?

A.   I don't recall if I did.

Q.   What if it was a dangerous situation, I mean, you didn't know what you were walking into, correct then?

A.   If it would have been a dangerous situation, then I wouldn't have been going alone and my chief would've let me know that.

Q.   So your testimony today is that your chief told you nothing about the actual nature of why you were going to the school to investigate something?

A.   Correct.

Q.   And your testimony today is that you didn't inquire about what the nature of the investigation that you were conducting was going to be before you entered that school?

A.   I don't remember if I asked him or not.  That information was never relayed.

Q.   Well, then you get to the school and you do talk to people who have information, correct?

A.   Correct.

Q. And what do they tell you?

A. That there are allegations of an inappropriate relationship and nude photos being sent between Mr. Schroeder and a 13-year-old seventh grade student.

Q. So at your -- your testimony then today is that after you hear that, that Mr. Schroeder who you're investigating for that, would be free to leave the school at that point?

A. Yes.

Q. Whenever you conduct -- Have you conducted traffic stops before?

A. I have.

Q. Whenever you're conducting a traffic stop, do you immediately ask the person to hand over their phone?

A. No.

Q. Do you ask them to hand over their electronics?

A. No.

Q. And you turned off your body cam whenever you talk to your chief, correct?

A. Whenever I talk to somebody else over the phone, yes, I turn my body cam off and went to a different room.

Q. Why?

A. For privacy.

Q. Why would the conversation need to be private?

A. Because it was investigative things between law enforcement --

38

Q. What was being discussed with your chief?

A. I wasn't talking to my chief anymore.

Q. Who were you talking to?

A. Talked to numerous people.

Q. Who?

A. I believe I've already said it. Lieutenant Oswald, ADA Scarpelli, G.K.'s mom. I also contacted the Child Advocacy Center.

Q. Okay. And when you talked to your lieutenant, what did he tell you about what to do and how to approach the situation?

A. I don't have a lieutenant.

Q. Okay. Lieutenant Oswald, is that who you --

A. I --

Q. -- talked to?

A. Yes.

Q. What did Lieutenant Oswald talk to you about?

A. I asked him for assistance in the investigation and asked if they could send another detective.

Q. So what point in time in this timeline did you know what you were investigating?

A. I didn't know the totality of everything that had occurred until later that evening.

Q. That's not my question. My question is, when did you first learn about the nature of what you were investigating?

A. Once I started talking with the school staff and then

G.K., I believe it would've been some time just after 2:00 o'clock with that particular victim.

Q. And so that took place prior to any contact or discussion with Mr. Schroeder, correct?

A. Yes.

Q. So you're saying that you have a 13-year-old girl who is telling you these things about an inappropriate relationship and pictures and things being back and forth sent, and your testimony is that you would've let Mr. Schroeder leave that room if he had tried?

A. Yes.

Q. Why? Did you not believe the allegations that were being made?

A. Our ADA requested that a forensic interview be done and no arrest be completed until after that.

Q. Okay. And yet you didn't check with the ADA before you actually arrested -- before you took him to the police station, correct?

A. I never took Mr. Schroeder anywhere.

Q. Okay. Were you the one leading the investigation?

A. Up until that point, yes.

Q. Okay. Who became the leader of the investigation?

A. After the other victim was discovered and those things would've happened out in the county, it became Detective Steber.

40

Q.   Okay.  And you walked in and we saw that video where there was a discussion about CSAM, correct?

A.   Correct.

Q.   And why was that -- why were those questions being asked?

A.   In regards to the phone.

Q.   Okay.  And so you wanted to cover your bases and make sure that you do look into the phone, correct?

A.   We wouldn't look into the phone without consent or a search warrant.

Q.   Right.  So were you assisting in providing information related to the obtaining of those search warrants?

A.   I believe I did the one for the residence.

Q.   Okay.  So I'm going to ask you if you look beneath your binder, there's Exhibit 102.  This Exhibit 102 has already been admitted.

A.   Okay.

Q.   Do you recognize this document?

A.   I have never seen it.

Q.   Okay.  I'd like you to --  And if you look at the bottom, there's Bates numbers that say reports and then they have numbers on the bottom.  Do you see those?

A.   Okay.

Q.   If you could turn to page 81.  Paragraph nine, the information in that paragraph related to the things that Mr. Schroeder allegedly admitted to are contained in there,

correct?  In paragraph nine?

A.   Yes.

Q.   Did you provide that information to whoever was preparing this affidavit for the search warrant?

A.   I don't know if they took that from me or Detective Steber.

Q.   Okay.  Now, if you could go to page -- to Exhibit 101, that's on the front.  This is the search warrant related to the iPhone, and if you could look at those Bates numbered pages, again to page 121.  There's a probable cause section.  Do you see that there?

A.   I do.

Q.   Now, you would agree with me, and now you can read them if you'd like, but paragraphs seven and eight, the probable cause section is all information that was obtained during the interviews of Mr. Schroeder, correct?

A.   I'm still reading.  Sorry.

Q.   Go ahead.

A.   Okay.

Q.   So you agree with me?

A.   Could you ask the question again?

Q.   Sure.  So the information that's contained in those two paragraphs, which provides the probable cause basis to search the iPhone, is all information that was obtained during the interview at the school of Mr. Schroeder, correct?

42

A.   I'm not for sure on that.

Q.   Okay.

A.   I didn't compile the search warrant.

Q.   Okay.  Fair enough.  So Mr. Schroeder was never left alone in that room, correct?

A.   No.

Q.   And, in fact, when -- when you left, Detective Steber was in there, correct?

A.   Correct.

Q.   And when you came back in and Detective Steber left, he told you to hang out with him, correct?

A.   Correct.

Q.   Whenever he told you to hang out with him, did that mean to you that you should not let him leave the room?

A.   No.

Q.   So within mere, looked like seconds, after you hung out with him, two uniformed officers came in, correct?

A.   No, I believe that was a fast forwarding of a video.

Q.   Okay.  So how many minutes later?  Ten minutes?  Would you say it was 10 minutes that you hung out with him?

A.   It could be.

Q.   And during that time you also -- you did ask some questions, correct?

A.   The only questions I asked were the -- if there was another student, I had overheard that, and if they went to the

43

school.

Q. Right.

A. I never asked him any more specific questions than that.

Q. Well, I mean, you would agree with me that by asking him if there was another student that that would elicit incriminating information if he said yes, correct?

A. I said I had overheard there was another student, and he just confirmed that there was.

Q. That's not my question. You would agree with me that by asking that question, you were attempting to elicit or could elicit incriminating information?

MR. FUNNELL: Objection, Your Honor. This is all argumentative. The factual record is what it is, and counsel can brief it afterwards, but to have the witness describe legal standards and use those sorts of terms, it's argumentative.

MR. LUCZAK: Well, if I may? I believe that this door was opened by inserting the assistant district attorney into this, and using that as essentially like a failsafe that, you know, that equates, I'm guessing they're going to argue to his state of mind related to this. So I'm just inquiring as to his state of mind and what he believed the standards were because I think it goes to, I think it's relevant to I think an argument that the Government's going to try to make.

MR. FUNNELL: Your Honor -- I'm sorry.

THE COURT: Go ahead.

44

MR. FUNNELL: The question was about eliciting an incriminating response. The D.A.'s Office conversation didn't have to do with that, it had to do with a custody question. We've already covered that. So now he's asking questions about eliciting an incriminating response. The Court can make those determinations based on the testimony that -- the facts. What they're asking for here are legal conclusions and making arguments.

THE COURT: Right. I agree. And, Mr. Luczak, you know, as this has been going on, I had that thought to myself that, you know, I don't know how much you're going to get on some of the points you're trying to make with this witness. It may be better --

MR. LUCZAK: Yeah.

THE COURT: -- with the next two people that come in. And, frankly, what he thinks versus what the objective reasonable -- what a reasonable person in Mr. Schroeder's position thinks is more important than somebody's communication. So I'll give you some leeway, but I think the point's been made, the record speaks for itself, and what's on the video. You can move on.

MR. LUCZAK: Okay. Thank you.

BY MR. LUCZAK:

Q. All right. So I just have a few more questions then related to those conversations that you had with the assistant

45

district attorney. Did you apprise her of the room and what it looked like where Mr. Schroeder was being held?

A. That had never even come up.

Q. Okay. What did you convey to her about the way in which he was being held and questioned?

A. For one, he wasn't being held, and also we never had that conversation.

Q. Okay. So what -- what did you -- what did you talk to her about then?

A. I provided her the material that we had and what was being presented at the time and what the next steps forward were, which were the forensic interview, and that she relayed that she wanted the forensic interview done before any kind of custodial arrest would happen for that victim.

Q. Okay.

MR. LUCZAK: I have no further questions.

THE COURT: Anything from the Government?

MR. FUNNELL: Just a couple questions.

REDIRECT EXAMINATION

BY MR. FUNNELL:

Q. When you were speaking with G.K., did Detective Steber arrive during that interview?

A. Yes. Within that minute G.K. had just told me that her and Schroeder had been talking and they were going to meet up over some time during the time of spring break, which would've

been March 17th to March 23rd, 2025, for purposes of anal sex and for her to give him road head.

Q.   All right.  And those are in Exhibit 12-A, those statements, correct?

A.   Correct.

Q.   So Detective Steber was there with you for that portion of the interview?

A.   He came in just at the tail end of that, and then I reiterated that to him on body cam.

Q.   So you supplied him with the information on scene that you had been given by G.K. orally?

A.   Yes.

          MR. FUNNELL:  That's all.  Thank you.

          THE COURT:  Mr. Luczak?

          MR. LUCZAK:  Nothing further.  Thank you.

          THE COURT:  Okay.  Then we're finished with this witness?

          MR. FUNNELL:  Yes, Your Honor.  Thank you.

          THE COURT:  All right.  Then you're excused, sir. Thank you.  Is the Government prepared to move forward with their next witness?

          MR. HUMBLE:  Yes, Your Honor.  The Government will call superintendent Cory Erlandson.

          THE CLERK:  Please raise your right hand.

          CORY ERLANDSON, called as a witness herein, after

47

having been first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  You may be seated.  Please state and spell your first and last name for the record.

THE WITNESS:  Cory Erlandson, C-O-R-Y, E-R-L-A-N-D-S-O-N.

DIRECT EXAMINATION

BY MR. HUMBLE:

Q.   And who is your employer and what capacity are you currently employed?

A.   The superintendent of the school district for Mishicot.

Q.   And how long have you been the superintendent?

A.   Beginning my third year.

Q.   And did you work there prior to becoming superintendent?

A.   No, I did not.

Q.   Okay.  You were working on April 16th of 2025?

A.    (Nods head.)

Q.   Okay.  And there was a time where you were asked by law enforcement to get Mr. Schroeder from his classroom; is that right?

A.   Yes.

Q.   Could you describe those circumstances for the Court?

A.   We knew that there was a -- an issue where they were going to need to speak with him, I knew where he was, and so I walked

48

down to his classroom, brought a principal down there to cover his classroom, asked if he would come with me, and then walked him down the hall to a conference room.

Q.   And putting aside the issue that led to you going to get Mr. Schroeder out of the classroom, is it uncommon for you to have to pop down and pull a teacher out of a classroom?

A.   No.

Q.   Have you had to do that with Mr. Schroeder before?

A.   I have had to talk to him during the school day before.

Q.   Okay.  And did it begin very much like those conversations?

A.   Yes.

Q.   Okay.  Did you inform Mr. Schroeder why he was coming out of his classroom?

A.   I did not.

Q.   Okay.  Did you take him anywhere?

A.   I walked him to --  As we were walking to the conference room, he asked if he could go to the bathroom, and I stopped and let him go to the bathroom.  Came out about a minute later and then I took him down to a conference room in the district office.

Q.   Did you make small talk other than him asking to go to the bathroom?

A.   No small talk.

Q.   He didn't ask you what this was all about?

A.   No, he did not.

Q.   Did you find that odd?

A.   I found that odd, yeah.

Q.   Why do you say that?

A.   I've known him for a long time.  He typically would ask, you know, if I had to talk to him, what is this about?  He did not in this situation.

Q.   Okay.  And you placed him in that conference room at the request of law enforcement?

A.   Yes.

Q.   And but you were aware of the back information involving G.K.?

A.   Yes.

Q.   Because you had been in that room with Detective Brooks, right?

A.   Yes.

Q.   And the other individuals?

A.   Yup.

Q.   Okay.  Had you made a decision as to any action you were going to take with regard to Mr. Schroeder back on April 16th of 2025?

A.   No.

Q.   Okay.  So there was not a decision made that he would be suspended at a certain time of the day?

A.   No, I don't know that we knew enough information at that

50

point.  I guess --  Yeah, I don't know.

Q.   Okay.  So no -- no definite conclusions had been made on your end?

A.   Nothing definite, no.

Q.   Was it your intent to speak with Mr. Schroeder at some point about that allegation?

A.   I was kind of following law enforcement's lead at that point, so I didn't know what the next steps would be.

Q.   Okay.  But in your mind there was not a -- there was not enough evidence to conclusively decide what was going to happen with Mr. Schroeder?

A.   I didn't know enough yet.

Q.   Okay.  Did you ever at any time in speaking with Mr. Schroeder threaten his job?

A.   No.

Q.   Threaten his employment?

A.   No.

Q.   Threaten his coaching position?

A.   No.

Q.   Did you ever discuss any punishment, anything like that?

A.   No, we didn't discuss anything.

Q.   Okay.  Other than the request to go to the bathroom?

A.   Correct.

Q.   And once you placed Mr. -- or escorted Mr. Schroeder to the conference room, did you have any more involvement with

what was going on between law enforcement and Mr. Schroeder?

A.    No, I walked out.

Q.    Did you have any further contact with him that day?

A.    No.

MR. HUMBLE:  No further questions, Your Honor.

THE COURT:  Mr. Luczak?

MR. LUCZAK:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LUCZAK:

Q.    When was the first time that you became aware of any sort of allegations related to Mr. Schroeder?

A.    Would've been the afternoon of that day, yeah, the athletic director informed me that there was something I needed to hear about.

Q.    And do you remember approximately what time that occurred?

A.    I would guess around 1:00 p.m.

Q.    Okay.  And were you the one that called law enforcement, or how did that work?  How did law enforcement end up coming to the school?

A.    I don't remember.  I remember that in a -- in a conversation with the administrators who had spoken with the student that it became evident that we were going to need to involve law enforcement.  I don't remember who made the call.

Q.    Okay.  And the --  Were you involved in a conversation that occurred between the administrators, we'll say, and anyone

52

from Mishicot P.D.?

A.   Could you clarify what you mean by that?

Q.   Well, Detective Brooks, do you know who I'm talking about when I say --

A.   Yes.

Q.   Did you come in contact with Detective Brooks that afternoon after these allegations came out?

A.   Yes.

Q.   Did he appear to be the one kind of leading the investigation at that point?

A.   At first, yes.

Q.   Okay.  And what information --  Well, let me just ask you this.  Were you on-site at the school once you heard the allegations, or did you come later when there was --

A.   I was at school the whole time.

Q.   You were at school.  Okay.  So you were aware that -- when Detective Brooks showed up at the school?

A.   Yes.

Q.   Okay.  Did you have a conversation with Detective Brooks about the nature of what the administrators had learned about what the student was saying related to Mr. Schroeder?

A.   Yes.

Q.   And what was that information that was conveyed to Detective Brooks?

A.   Again, I don't remember who said what, because we were all

in the room together, but there was a conversation about a student had received inappropriate -- a student seen another student's phone where they had seen inappropriate text messages from Mr. Schroeder.

Q.   And at that point it became very clear that Mr. Schroeder was going to be subject to some pretty serious consequences, correct?

A.   I wasn't sure at that point.  It wasn't my --  I'm not sure.

Q.   Okay.  Who at the school was leading the investigation into this situation that arose?

A.   When law enforcement took over, we were just kind of standing by and letting law enforcement do their thing at that point.

Q.   Okay.  And when you --  So you escorted Mr. Schroeder down to that room?

A.   Yes.

Q.   We've seen the videos now, it's a conference room, correct?

A.   Yes.

Q.   And there's two doors there, correct?

A.   Yes.

Q.   When you walked him down to the room, was Detective Steber in the room yet, or not?

A.   I don't think so.

54

Q.   Did Detective Steber ever have any conversations with you?

A.   Yes.

Q.   He did.  Okay.  What were --  When did those conversations take place?

A.   After Detective Brooks was, you know, sort of asking questions of one of the victims, Detective Steber came in some time during those questioning and sort of took over the lead at that point.

Q.   Okay.  Did Detective Steber ever say anything to you to the effect that Mr. Schroeder was not going to be, you know, leaving the school on his own volition?

A.   No.  Not before --  Not before I went and picked him up from his classroom.

Q.   Okay.  How about after?

A.   There was --  I don't remember if it was Brooks or Steber, but we did have a conversation about the best way to escort him out of the building, the best path to take.

Q.   And whenever that discussion was had, I take it that Mr. Schroeder was still in that room being questioned, correct?

A.   I don't know.

Q.   Okay.  But it's fair to say that you didn't see Mr. Schroeder leave the school at that point, correct?

A.   No.  I do --  I did see him leave the school when he did leave.

Q.   Right.  And how did he leave the school?

55

A.   I believe he was in handcuffs with his hood up, and walked out of a -- of a side door that was pretty close to that conference room.

Q.   Okay.

MR. LUCZAK:  All right.  I have no further questions.  Thank you.

THE COURT:  Any follow-up from the Government?

MR. HUMBLE:  Nothing.  Thank you.

THE COURT:  All right.  Thank you.  So is there one more --

MR. HUMBLE:  From the Government, yes.

THE COURT:  -- one more witness?  Okay.  We have been going for about an hour and a half.  Why don't we take about a five-minute recess and come back.

MR. HUMBLE:  Sounds good.  Thank you.

(A recess was taken.)

THE COURT:  Please, everybody, have a seat.  Okay.  Is the Government prepared with their next witness?

MR. HUMBLE:  Yes.  The Government calls Nate Steber, the Manitowoc County Sheriff's Department.

NATHANIEL STEBER, called as a witness herein, after having been first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please be seated.  Please state and spell

56

your first and last name for the record.

THE WITNESS:  Nathaniel Steber, S-T-E-B-E-R.

DIRECT EXAMINATION

BY MR. HUMBLE:

Q.   Who is who your employer, and what capacity are you currently employed?

A.   Currently I work for the Manitowoc County Sheriff's Office as a detective.

Q.   How long have you been with the sheriff's department?

A.   I've been with the sheriff's department approximately four years.  Prior to that --  I have a total of 13 years experience in law enforcement.

Q.   Okay.  And back on April 16th of 2025, you were told by your boss to go to the Mishicot High School; is that correct?

A.   Yes, I was.

Q.   What was the purpose of going there?

A.   He informed me that there was a student there that was reporting some allegations to ultimately Detective Brooks, and he basically told me to go and assist him with the investigation that he was already kind of getting into.

Q.   Okay.  So you're aware that Detective Brooks was part of this investigation already?

A.   Yes.

Q.   And when you first arrived at the high school, can you explain to the Court, like, did you meet with Detective Brooks?

57

Did you just walk right into the meeting?  How did it --  What was your first contact, I guess?

A.   So as soon as I got to the school, walked in the front doors, met with Detective Brooks, who kind of gave me an overall summary of what was going on.  And then we immediately proceeded up to a, I guess, a private office area where we began to speak with the initial victim, G.K.

Q.   And if you recall, with that first conversation you had with Detective Brooks, was that a lengthy conversation?  Was it a quick conversation?

A.   No, it was very quick.  It was as we were walking from like kind of the entry area to the school up to where he had been speaking with G.K.

Q.   So upon entering the meeting with G.K. and the other individuals, what did you know about what you were investigating?

A.   That there was some allegations of a teacher being involved in sending and receiving some images of one of the students there being G.K.

Q.   And you sat in on a substantial portion of that conversation with G.K.?

A.   I had a brief summary with G.K., the interview had already been initiated by Detective Brooks.  I can't speak to how long he was there prior to my arrival, but while I was there, it was -- it was a quick summary with G.K. about what she had

58

already divulged to Detective Brooks, so I was kind of on the same page with him.

Q. And based on what you had heard from G.K., but also Detective Brooks, did you believe at that point that you had probable cause to seize Mr. Schroeder's phone?

A. Based on both of those statements independently, yes.

Q. Did you have the opportunity to speak with the superintendent?

A. I did.

Q. And when did that occur?

A. That was after we had the conversation or the summary with G.K. while we were still kind of -- while we were still at the school, and that -- the superintendent was also in that summary when I walked into the interview with G.K., so he was on the same page as Detective Brooks and I.

Q. Did you make any requests of the superintendent?

A. I specifically asked him where Ryan was and that if I was able to speak with him somewhere at the school, which he agreed to.

Q. Did you give any -- provide any direction to the superintendent?

A. Other than to locate him and bring him into a place where I could speak with him, no.

Q. Did you -- Did you tell the superintendent you intended to arrest Mr. Schroeder?

59

A.   I did not, no.

Q.   Did you tell him anything else other than you just needed to speak with him?

A.   That is all I told him.

Q.   You eventually went to the conference room?

A.   I did, yes.

Q.   Okay.  And was Mr. Schroeder in the conference room when you arrived?

A.   He was.  The superintendent advised he brought him into that conference room, kind of pointed me in that direction.  Detective Brooks was also familiar with it, so we both went to that specific conference room.

Q.   And if you have a --  You have a binder in front of you, tab 14.  When we talk about the conference room, which I -- we in the courtroom have seen on video, is those various photographs that comprise Exhibit 14, is that essentially capturing what that conference room looked like?

A.   Yes, that is consistent with the conference room I met with him in.

Q.   What were you wearing that day?

A.   That day I was wearing six-pocket cargo Carhartt pants and like a Columbia fleece zip-up.

Q.   You were carrying a weapon?

A.   Yeah, I had my gun and my badge on me.  That was also covered up by my Columbia zip-up.

Q.   Both your firearm and your badge were covered up by your jacket?

A.   Correct.

Q.   Did you ever make a point to display either of those to Mr. Schroeder?

A.   I don't believe so, no.

Q.   Do you recall how you began your conversation with Mr. Schroeder?

A.   Yes.  Basic introductions, my name, Detective Brooks introduced him as well, and then basically explained who I was, asked that we both -- he have a seat.  I obviously sat down, and then we kind of just got into the conversation from there.

Q.   Fairly early on in that conversation, you asked Mr. Schroeder for his phone?

A.   Almost immediately, yes.

Q.   And what was -- why was that?

A.   Because I knew I had probable cause to seize it based on the information provided by Detective Brooks and G.K., ultimately.

Q.   And did you, once receiving the phone, did you ask Mr. Schroeder for a pass code so that you could get into the phone?

A.   I did ask, however, he did not provide that to me.

Q.   What did he say?

A.   He specifically asked me to talk first.

61

Q.   Okay.  And did you oblige him?

A.   I did.  I explained that this was our time to talk, and we proceeded to kind of get into the conversation of the investigation.

Q.   Okay.  And what was your reason overall for speaking with Mr. Schroeder?

A.   He was the person that was identified by G.K. as being involved in sending these images back and forth.

Q.   Just because G.K. had divulged certain information, did that end your investigation?

A.   No, it did not.

Q.   And is that the reason you felt a need to talk with Mr. Schroeder?

A.   That was a reason, yes; however, that was the infancy stages of the beginning of our overall investigation.

Q.   You were willing to hear his side of the story?

A.   Correct.

Q.   In fact, it wouldn't be outside the realm of possibility that G.K. was making things up and Mr. Schroeder had nothing to do with anything?

A.   That is a possibility, yes.

Q.   Okay.  So you had this conversation with Mr. Schroeder. Was he in custody?

A.   No, he was not.

Q.   Was he free to leave?

A.   Yes, he was.

Q.   Did Mr. Schroeder request anything that you did not --
Well, did Mr. Schroeder request anything?

A.   Throughout our conversation, I believe he asked me to --
to shut the door at one point in time.  Other than that, no.

Q.   Well, he did ask Detective Brooks to leave; is that right?

A.   He did ask Detective Brooks to leave, maybe 10 minutes
into the interview, which we agreed with; and I asked Detective
Brooks to step out, which he did.

Q.   Am I incorrect that that request by Mr. Schroeder was
directed more toward you than it was Detective Brooks?

A.   Yes, that is correct.

Q.   And you, in fact, asked Detective Brooks to step out at
the request of Mr. Schroeder?

A.   Correct, yes.

Q.   Did he ask for food?

A.   No.

Q.   Did he ask for drink?

A.   No.

Q.   Did he ask for bathroom breaks?

A.   No.

Q.   If he had, would you have provided those things?

A.   Absolutely.

Q.   What was your tone during your conversation with
Mr. Schroeder?  How would you describe it?

A.   I would say very conversational.  I didn't raise my voice, I didn't really have any inflection one way or another.  I would say it was conversational.

Q.   Going into your conversation with Mr. Schroeder, you were aware of one victim, G.K., correct?

A.   Correct.

Q.   There came a point when another minor individual's name came up?

A.   That is correct.

Q.   Did that change at all, the trajectory of your investigation?

A.   At that point in time there was no indication at all of any type of change other than the information he was providing, which I was trying to collect, but at that time there was no change in how I was going to proceed with -- with anything during the conversation between him and I.

Q.   At times you stated something along the lines to Mr. Schroeder that he should assume that you knew more than he knew.  What was the point of saying that to him?

A.   I think that came up during the interview -- or during the conversation with him regarding the second victim, because I obviously wanted him to continue to explain that -- the information and provide me with that context so I could better investigate that second potential victim.

Q.   Is that pretty standard law enforcement technique to not

divulge all your cards on the table what you know about an investigation?

A.    Absolutely.

Q.    Did you ever make any threats to Mr. Schroeder?

A.    No.

Q.    Did you ever make any promises to him that if he continues to cooperate or continues talking with you, that he could get some type of lesser treatment or better treatment, anything like that?

A.    No.

Q.    When you began your conversation with Mr. Schroeder, was it your intent that he would be arrested and taken down to the sheriff's office following your conversation?

A.    No, not at all.

Q.    Did you develop a plan that perhaps if you could get him to talk at the school, you could later Mirandize him and get him to talk at the police station -- or the sheriff's office?

A.    No.

Q.    Your sole reason for speaking with Mr. Schroeder in that conference room in the afternoon on April 16th was to investigate the allegations that were made by G.K.?

A.    Yes.

Q.    And then following the revelation by Mr. Schroeder of the second individual, R.M., you went -- continued to investigate now a two track, essentially, victim case?

65

A.   Correct.  Yes.  We had multiple avenues to go down at that point.

Q.   At a certain point later in your conversation with Mr. Schroeder, you again asked him for a pass code?

A.   Yes, while we were still at the school.  Correct.

Q.   And did he give you the pass code?

A.   Yes.

Q.   And we've seen video, and the Court has the audio.  You enter the pass code into the phone; is that right?

A.   I did, yes.

Q.   And you -- what did you do once you put the --  What was the purpose of putting the pass code into the phone?  What did you do once you put the pass code into the phone?

A.   So kind of twofold.  A., confirming the information he was telling me is accurate, so I did that, confirmed the pass code was legitimate.  At that point then the phone went into airplane mode to try and preserve as much evidence as I -- that would have or may have been on there.

Q.   Well, let's be precise.  The phone didn't put itself in airplane mode?

A.   No, I did that.

Q.   And what is the purpose of putting a phone in -- a suspect's phone into airplane mode?

A.   So airplane mode basically limits the ability for someone to remotely connect to it and potentially erase or delete

images or evidence.  In this case that could be substantial for this type of investigation.

Q.  Is that a pretty standard law enforcement technique?

A.  Absolutely, yes.

Q.  Is that something that your department essentially guides you to do in these types of cases involving electronic devices?

A.  Yes.

Q.  And when you say wiping the phone, is the concern that possibly Mr. Schroeder goes home at the end of the day and he can use another electronic device to wipe what's on the cell phone if you don't put it in airplane mode?

A.  Correct.  He could access it remotely or someone else for that matter could've done that for him, himself as well, even though the phone was in my possession, so that's the purpose of airplane mode to try and defeat some of that from happening.

Q.  Okay.  Again, and the audio, not as good as the video, you do access the phone.  Did you ever search the content of the phone?

A.  At that time, no.

Q.  You did later?

A.  Yes.

Q.  Did you look at anything other than entering the code and putting it into airplane mode?

A.  No.

Q.  And I'm talking at the school.

67

A.    Correct.  I did not.

Q.    Okay.  So any allegations that you searched the phone at the school would be what?

A.    False.

Q.    In addition to getting the access code for the phone, were you also given another access code by Mr. Schroeder?

A.    I was.

Q.    And was that in short succession after you received the pass code for the phone?

A.    Yes, it was, yeah, similar time frame of that conversation topic.  He provided the pass code to one of the applications, My Eyes Only, folders, and that has a separate pass code to it, which he provided a six digit code for.

Q.    Okay.  And as part of the conversation with Mr. Schroeder, you essentially asked him if you were going to find CSAM or child sexual abuse material on the phone; is that right?

A.    Correct.

Q.    And what did he tell you?

A.    That there would be.  Specifically the deleted folders and then that application that we just referenced.

Q.    At one point, and again, the Court, we have seen the video, Detective Brooks interrupts your conversation and essentially pokes his head into the conference room and asks if there was CSAM.  Do you recall that?

A.    I do.

Q.   Can you describe that, your recollection of that for the Court?

A.   Yes.  He was on the phone with my supervisor and asked me if, in fact, there was CSAM on the phone.  I told him that there was based on the conversation that we had, that Mr. Schroeder and I had.  And then he asked again, or a clarifying question, if I viewed it?  And I told him, no, I didn't, and that was solely based just on the fact that what Mr. Schroeder was telling me.

Q.   If --  My recollection, but is it fair to say you might've said, not yet?

A.   Correct.

Q.   Okay.  Essentially you -- you had been given consent because he gave you the pass code for the phone, correct?

A.   Correct.

        MR. LUCZAK:  Objection.  Calls for a legal conclusion.

        MR. HUMBLE:  I'll move on.

        THE COURT:  Sustained.

BY MR. HUMBLE:

Q.   You said you --  Well, strike that.  You said did you ultimately end up searching the phone?

A.   Correct.

Q.   Where did that occur?

A.   At the sheriff's office.

Q. And do you recall approximately when that occurred?

A. I believe it was 5:40 p.m., ish, maybe a little bit after.

Q. Okay. And why do you approximate that time?

A. Because prior to that happening, I was in the, what we call like a soft interview room with him, and that is the time that I put on the consent to search media form, which he signed, and I time stamped it and witnessed it for him.

Q. You've got that binder in front of you. Let's look at Exhibit 9, 10, and 11, but let's start specifically with Exhibit 10 if we can. Do you see Exhibit 10?

A. Yup, I have it here.

Q. Do you recognize it?

A. That is the form, or a copy of the form I was referring to.

Q. That is the consent form that you gave to Mr. Schroeder back on April 16th of 2025?

A. Correct.

Q. You noted the time?

A. Yes.

Q. That the consent was given, the written consent?

A. Yes, 5:42.

Q. Okay. It's scribbled out. Do you recall why that might be scribbled out, changed to 5:42?

A. I probably wrote the wrong time.

Q. Okay. Down, it says lock codes or patterns toward the

70

bottom. It says 0420 for the phone, and then it says Snapchat 1138, and it looks like two numbers were cross -- were scribbled out. Do you know why those numbers were scribbled out?

A. Yes. I originally wrote down the six digit code that he gave me when we were at the school, however, once the form was, I guess, signed and I began to search that specific Snapchat app, I immediately realized that it was a four digit lock code on it, which is not consistent with the pass code that he provided me, so I had to clarify, and it turned out to be just the first four digits were accurate and it wasn't the last two, so I scribbled those out.

Q. So that would reinforce the idea, would it not, that you could not have searched that Snapchat back at the school because you did not have the correct code?

A. Correct.

Q. You -- Your conversation back at the school, I know I'm jumping backwards and forwards, but go back to the school, there was a moment after -- after much of your conversation with Mr. Schroeder that you stepped out and asked Detective Brooks to step into the conference room; is that right?

A. Yes, that was near the end of that conversation.

Q. And what was the purpose of having Detective Brooks step in?

A. I was going to step out and I believe make another phone

call or make a phone call to my supervisor, and at the same time I wanted that line of communication to remain open with Mr. Schroeder. Based on the conversation initially with him, he knew that Mr. -- or Detective Brooks was a Mishicot guy, so I basically wanted that line of communication open, the rapport to be able to continue to be built more than what it already had been at that point, and he -- he did that.

Q. Did you instruct Detective Brooks to ask any questions?

A. No.

Q. Did you ask Detective Brooks to do anything other than just stay in the room?

A. No.

Q. And you said you stepped out to call your boss. That would be Lieutenant Brett Oswald?

A. Correct.

Q. And why all the back and forth with Lieutenant Oswald?

A. The way that this investigation began was approximately 2:00 o'clock when I got involved, I on my way up to the school had been in communication with him and our District Attorney's Office. Obviously the conversation with G.K. happened, and from that point on, I was told, leading up to the conversation with G.K., I was instructed by not only my boss, but the District Attorney's Office, that under no circumstances are we going to arrest Mr. Schroeder based on the information that Detective Brooks provided to me and -- and my boss.

72

Q.   Okay.  Did you --  I'm confused, though.  Did you specifically have a conversation with the assistant district attorney, her telling you that you were not to arrest Mr. Schroeder until after a CAC evaluation had taken place?

A.   Yes, that conversation happened and then a second conversation happened all while traveling to the school with my boss that echoed that same opinion.

Q.   But at some point the decision was made, I'm assuming by you, to take Mr. Schroeder into custody?

A.   Yes.  And that is where the investigation kind of turned based on the information that Mr. Schroeder provided identifying not only a hands on, like, physical offense, but another student that was potentially -- he would've had access to that was still currently at the school that I hadn't even spoken with yet.

Q.   So when you stepped out to call your boss, Lieutenant Oswald, did you also make the request to him or did you separately make the request for some other deputies to show up to help you convey Mr. Schroeder to the sheriff's office?

A.   I believe after I spoke with Lieutenant Oswald, he made that request while I was on the phone with him.  From at that point then a marked sheriff's office car with a uniformed deputy arrived to transport Mr. Schroeder to the sheriff's office.

Q.   Is it fair to say that was the point where Mr. Schroeder

73

was in custody?

A.   At the time that they arrived and we --

MR. LUCZAK:  I just object that.  Calls for --

THE COURT:  Can you repeat the question?

BY MR. HUMBLE:

Q.   Is that --  Is it fair to say that at that point when transportation officers have arrived, deputies have arrived, Mr. Schroeder was in custody?

A.   Yes.

Q.   Formal custody?

A.   Yes.

MR. LUCZAK:  My --  I mean, the Court can take it for what it's worth.

THE COURT:  I got it.  Go ahead.

BY MR. HUMBLE:

Q.   And subsequent to that, those transport officers showing up, then it was essentially planning with those deputies and Mr. Schroeder how to get him out of the high school in the least obvious way?

A.   Yes, that all happened in that same conference room where I was speaking with him.

Q.   Can you tell us briefly, it doesn't need to be super detailed, how did you treat Mr. Schroeder as he was leaving the building?  What was the plan?

A.   I explained to him that the plan was going to be to walk

74

with him, not in handcuffs, down what I would consider one of the main corridors of the high school out to a separate hallway that no one else would've been using, or in at that time that led exactly to an exit door that the squad -- the squad car was parked, I guess, as close as you could get to on the street. And at that point in that hallway is where the handcuffs were applied. We then basically walked him to the squad car from that, I guess, secure hallway.

Q. Curious. Why didn't you just arrest Mr. Schroeder yourself and transport him in your vehicle?

A. My vehicle is not equipped to transport people. As a detective, we don't have any type of appropriate restraints or recording equipment like a normal squad car would have, and therefore that's why I made the request per policy to have them transported, because he is -- was in custody at that time.

Q. Did you instruct either of the transport officers to question Mr. Schroeder?

A. Absolutely not.

Q. To your knowledge did they question Mr. Schroeder?

A. No.

Q. When he arrived at the sheriff's office, where was he placed?

A. In one of the -- the interview rooms up in our detective area.

Q. Did I hear you earlier refer to it as a soft interview

room?

A.    That is what we call it, yes.

Q.    What makes --  What differentiates an interview room from a soft interview room?

A.    A soft interview room, I guess, is our lingo.  It has a couch and two, like, soft, like, cushioned type chairs, it's like a lamp and an end table, making it a little more comfortable just in general versus just a plain room with two stationary chairs and a table.

Q.    And there was a little bit of delay, wasn't there, between when Mr. Schroeder was placed into the room, the interrogation room, and your arrival?

A.    Yes, there was.

Q.    What was the purpose of that?

A.    At that point in time, there was a lot of pieces to the investigation that were needed to begin to happen or continue to happen and updates needed to be made on top of some of the information that Mr. Schroeder provided.  I needed to verify, some of the acts obviously happened at the school, and I had no, like, intimate knowledge of the school, so I went and photographed some of those specific areas so I knew we were talking about like the correct locations that he disclosed to me in that first conversation.

Q.    And you had a somewhat lengthier conversation with Mr. Schroeder at the sheriff's office?

A.   Lengthier than the first conversation, yes.

Q.   And did you begin that conversation, or at least very shortly into the conversation, by advising him of his rights under the Miranda ruling?

A.   Yes.

Q.   And did you read each of the rights to Mr. Schroeder?

A.   Yes, I did.

Q.   Did he appear to understand?

A.   He -- He made a motion as if he did, and then I asked him to give me a verbal answer, and he -- he acknowledged that he did, or he said yes.

Q.   Essentially he nodded and then you made him verbalize it?

A.   Yes.

Q.   Okay.  Had anything changed since your conversation with him at the school?  Did he appear disoriented, not paying attention, distracted, anything like that?

A.   No.  He seemed very consistent from the initial conversation we had at the school with how he was acting at the sheriff's office.

Q.   So after he acknowledged being read his rights, you went ahead and had a lengthy conversation with Mr. Schroeder regarding both Ms. -- both G.K. and R.M.?

A.   That is correct.

Q.   Okay.  And at the conclusion of your conversation with Mr. Schroeder, did you have him sign a written Miranda consent

77

form?

A.   I did, yes.

Q.   Okay.  I'm going to ask you to look at Exhibit 9.  Do you see it?

A.   I do.

Q.   Is that the consent form that you had Mr. Schroeder sign?

A.   Yes, it is.

Q.   Did he hesitate?  Did he say he didn't want to?  Did he push back on you?

A.   No.

Q.   If you could turn to Exhibit 11.  That's headlined, statement?  What is that?

A.   This is a -- a copy of the statement form or apology letter that he wrote while in that same interview room after we concluded conversing.

Q.   And did you force Mr. Schroeder to fill this out?

A.   No.  The conversation --  Or the way that this came up was basically an option that he had as I frequently make similar, I guess, or provide similar options to other individuals that are involved in criminal cases that this is an option they have to write down to be able to express their side, and that's what he chose to do.

Q.   And it appears from the form that occurred around -- or finished, he finished writing that around 6:22 p.m.?

A.   That is when I witnessed it and, yeah, signed that time

78

stamp.

Q.   You didn't provide any content for him to put down, this was basically him with a pen and some paper and he was able to see what he -- express what he felt?

A.   Correct, yes.

Q.   It's the policy of the sheriff's office to video and audio record these interrogations in that soft interrogation room; is that right?

A.   Yes.

Q.   Okay.  And you've seen that video, I'm assuming you reviewed it?

A.   Yes, I did.

Q.   Is anything missing from that video?  Did you turn off the cameras at any time?

A.   After he had been removed from that room, I did, but prior to that, no.

Q.   I want to direct your attention to Exhibits 15, 16, and 17.  These were provided in discovery, and prior to the -- what was going to be the last hearing, you pointed these out to me as being particularly relevant as to the timing of what occurred with regard to Mr. Schroeder.  Could you explain to the Court the significance of these exhibits?

A.   Yes.  So after the consent form that we discussed was signed, at that point in time I left that interview room at the same time he was completing that apology statement and I began

79

to complete a search of the phone, specifically the phone itself, to verify the, I guess, the serial number and the make, model of it for purposes of a search warrant, and then also the account that he identified as being utilized to send and receive some of the images. And, I guess, that consent form that we discussed was signed at 5:42, and I took photographs as I went into each section of that cell phone, and you can see -- or at least on these photographs it says 5:55, and that is what I would call the, like, general --

Q. I'm sorry, which exhibit are you referring to?

A. Sixteen. Sorry.

Q. Okay.

A. In Exhibit 16, at the top portion of -- top left of the phone, it's time stamped 5:55. That would've documented the time that the photo was taken, and I confirmed that that photos -- the meta data in that photo on our server matched that same time frame, so the time stamp is correct on the phone of when I would've been searching that particular application.

Q. So just to be clear, you took the picture back on April 16th of 2025?

A. Correct.

Q. Which is Exhibit 16 that we're looking at. And more recently, prior to your testimony here today and what would've been a couple weeks ago, you went back and looked at the meta data?

A.    Correct.  I wanted to verify that the time on this image was a photo of Mr. Schroeder's phone, I wanted to verify that that was accurate in a time, and it is, in fact, accurate compared with the meta data.

Q.    The meta data and the photo?

A.    Correct.

Q.    Okay.  Then, again, whether it's Exhibit 17 or 15, just tell me which one you're looking at?  What are the significance of -- of those?  Might be easier to go to 17.

A.    Seventeen is the chat screen of the Snapchat application.  That time stamp was 5:57, and in there I photographed just the general screen because it matched up with the information he provided me of having R.M. as a friend on Snapchat, and that is obviously shown on there because she's the number one person on that screen as well.

Q.    And I -- I'd note --  I'll ask you the question, it's self-explanatory.  The little airplane up in the upper right-hand corner in these pictures signifies what?

A.    That is just to show that the phone was, in fact, in airplane mode.

Q.    And then go ahead and tell us what the significance of Exhibit 15 is, please.

A.    So Exhibit 15, that would've been the following day when the search warrant was being completed, and that photo was taken at 8:52 a.m. also matched the meta data that was received

when that photo was taken in that same platform.  Again, the phone is still in airplane mode at that time.

Q.   Okay.  So you -- you sought and received a search warrant for the phone?

A.   Yes, the following morning.

Q.   Despite the fact that you had verbal and written consent?  Or you believed you had verbal and written consent?

A.   Correct.

        MR. HUMBLE:  No further questions right now, Your Honor.

        THE COURT:  Mr. Luczak?

        MR. LUCZAK:  Thank you.

                    CROSS-EXAMINATION

BY MR. LUCZAK:

Q.   Detective, what type of training do you have related to interview techniques?

A.   So the original police academy I went to is 520 hours.  A portion of that, I couldn't tell you the exact amount of time, covers interviews.  Subsequent to that yearly or annual in-service trainings put on by our District Attorney's Office.  Were you looking for in hours or --

Q.   No, more content.  So whenever you were --  Did you use any of those techniques in interviewing Mr. Schroeder?

A.   Yes.

Q.   Which ones?

82

A. So during the interview, rapport building was a big one, because I had never met him, he had never met me, to kind of just establish a baseline of trying to get a feel for him and how he communicates and how he could see how I communicate.

Q. And when you came in the room, you would agree with me that, I mean, you said that you were conversational, but you also were commanding, correct?

A. No.

Q. You said, and I'll quote, you -- you said, "Give me your phone."

A. I did tell that to Mr. Schroeder.

Q. You would agree that that was a command, correct?

A. That was a request.

Q. Well, you weren't asking for permission, you said, "Give me your phone," and he said, "Why?" And you said, "Because I'm going to take it."

A. Correct. That was going to happen regardless.

Q. Right. So you indicated that you believed you had probable cause to take the phone at that time, correct?

A. Yes.

Q. Based on what?

A. The information provided by the victim.

Q. And it would be based on information provided by the victim related to things that Mr. Schroeder allegedly did, correct?

83

A. Yes.

Q. So at that time did you believe that you had also probable cause to arrest Mr. Schroeder?

A. No.

Q. Okay. So you believed it enough to take the phone, that there was probable cause, but not enough to arrest the person who allegedly did the things that gave rise to probable cause to take his phone?

A. Correct, yes. I believe there was probable cause to seize that item to substantiate some of the information that was being provided. But not enough to at that point arrest him.

Q. Well, that means that you believed what you were being told, correct, about the allegations?

A. Correct. I believe the information that was provided by a witness, I -- I have to -- it's my job to investigate and make sure that and follow up because there is times where people make things up for whatever reason, and part of that is to verify what they're telling me, and by way of doing that would be finding the evidence, i.e., seizing the phone.

Q. And you also took his iWatch, correct?

A. Yes.

Q. And you took it, you said, "Give it to me," correct?

A. I think I said, "I need your iWatch also."

Q. Yeah.

A. But that exchange happened.

84

Q.   So if he had gotten up at that point and walked out of the room, would you have followed him?

A.   Followed him like to try and stop him?

Q.   Yes.

A.   No.

Q.   You would've just let him walk out the door even though you believed the allegations that were being made against him in order to seize his phone, you would've let him walk out of the school and leave?

A.   Yes, I -- I guess I wouldn't have followed him anywhere. I would've let him do whatever he needed to do because I at that point had the phone seized already.

Q.   So your technique of rapport building, that's meant to build trust in order to elicit information from someone, correct?

A.   Yes, and I guess establish kind of a baseline of how he communicates and so he can kind of do the same for me.

Q.   And your goal in doing that is to get information that someone may otherwise be reluctant to give, correct?

A.   One of them, yes.

Q.   Especially they're reluctant to give incriminating information, correct?

A.   Correct.

Q.   And you would agree with me that one of the techniques would be to give someone the appearance that maybe they're not

85

in custody, that they're free to leave in order to build a

rapport with them to get them to talk, correct?

A.   I don't agree with that, no.

Q.   Okay.  So you think that if you immediately placed cuffs

on him that he would've been more likely to talk to you than

less likely?

A.   No.  I simply was having a conversation with him.

Q.   Right.  You made a choice, though, not to arrest him,

correct?  Or to give him the appearance of that, to formally

put cuffs on him, correct?

A.   Correct.  That did not happen.

Q.   Because you were trying to substantiate the allegations

that were being made against him, correct?

A.   I was trying to do a thorough initial interview.  Part of

that involved a significant time crunch based on some

information that was provided to me by the school, so that I

felt was pressing in that conversation with Mr. Schroeder

needed to happen sooner than later.  I would say that is a --

that is not the, quote, unquote, norm for how these

investigations would typically go.

Q.   Okay.  So would the norm have been that you would've just

read him his Miranda rights before questioning him?

A.   No.  By norm I mean we would have seized the electronic

device from him or wherever it would've been located and not

talked to him until we had all of the information -- or as most

information that we were able to uncover throughout the investigation.

Q.   Now, you said that you didn't make any promises to him, but you did provide him with some guidance, correct?

A.   What do you mean by guidance?

Q.   Well, you said, quote, "Your best angle at this point is to continue and keep it up," meaning continuing to answer questions.  You said that?

A.   I did, yes.

Q.   And you would agree with me that that's part of a technique to try to get him comfortable to tell him, hey, look, you should just continue to talk even though you're saying things that are incriminating, correct?

A.   Yes.

Q.   Because you also said, "Look, I'm not judging you, I'm not here to judge you.  I'm trying to get the information."  That's another technique, correct, to build rapport with -- with someone?

A.   I would say that falls under rapport building, but yes.

Q.   And the techniques that you're taught, they're not meant to elicit information that would be exculpatory, correct?

A.   Correct.

Q.   And he asked you about the next steps and, you know, what would happen, correct?

A.   Yes, during that conversation that happened at the school.

87

Yes.

Q.   And he --  And you said that the interview was a big part of it, and that, quote, "That looks and how that is completed is based on your cooperation," correct?

A.   Correct.

Q.   So you were reinforcing that despite him basically providing a very incriminating statement to you, that he should continue to do so, correct?

A.   I simply informed him that providing his side of that, what you just read, is helpful in our investigation.

Q.   Right.  But you're also able to, I mean, the Government kind of said it in a nicer way, that you don't have to show all your cards, but another way to say it is you can lie to people to try to get them to talk, correct?

A.   Deception is a tactic, yeah.

Q.   And you used deception in this case, correct?

A.   I did.

Q.   Because you wanted to continue to elicit these incriminating responses because it furthered your end which was to get all the information you could directly from Mr. Schroeder, correct?

A.   Correct.

Q.   And by the time you finally read him his Miranda rights, he had almost essentially provided you almost all of the information, correct?

88

A.   I would say he gave me a good summary, definitely did not give me a detailed account of a lot of the information.  The interview I think at the school was maybe 20 minutes.

Q.   And based on your training and experience, is it more common that someone waives their Miranda rights after eliciting a confession before reading their Miranda rights?

A.   Say that one more time, sorry.

Q.   Is it, based on your training and experience, is it common that when someone has already provided an alleged confession that they're more likely to waive their Miranda rights if they had not been given them before?

A.   No.  I --  I have, based on my training and experience, had it, I guess, both ways.

Q.   Okay.  But you would agree with me that eliciting a confession outside of the Miranda warnings and then asking someone to waive their rights, they may feel like there's no choice but to waive those rights because they already provided a confession, correct?

A.   I guess I can't speak to how he felt, but I can say that waiving the Miranda rights only applies when he was in custody, which happened at the sheriff's office, or I guess leaving the school and then continued at the sheriff's office with the interview.

Q.   Right.  I understand that that's your position, but that's -- you understand that we're going to have to -- the

89

Court's going to have to make that determination, correct?

A.    Correct.

Q.    Okay.  And when you were dispatched to the school, who gave you the call and what was the nature of the call?  Why were you going there?

A.    My supervisor, I think, came into my office and said he received information from Detective Brooks, I guess I'm unclear if that was a phone call or a radio, but either way he was in communication with him and then requested that I go and assist him with that investigation of potential juvenile and school teacher being involved in sending and receiving messages and nude photos.

Q.    Okay.  So based on that conversation, it was your understanding that Detective Brooks already knew what he was stepping into once he got to the school, correct?

A.    The way that I understood it, he had already been at the school and made that phone call to us after, or to my lieutenant after he received some of that information, but again, I don't know how logistically that played out.

Q.    And was it that information that allowed you or you believed that gave you the probable cause to take the phone?

A.    No.  The probable cause that I was acting on was the conversation I had with the victim once I got to the school, and that is where I established my probable cause directly from the information that she provided.

Q.   And that obviously happened prior to you making contact and having the interview with Mr. Schroeder, correct?

A.   Correct.

Q.   Okay.  Who ultimately was the lead investigator in this case?

A.   I was.

Q.   Did you ever tell Mr. Schroeder that you believed you had probable cause to seize his phone?

A.   No.

Q.   Did you ever tell him that he -- you had probable cause and you believed you did to seize his iWatch?

A.   No.

Q.   And Mr. Schroeder was the only suspect, correct?

A.   Correct.

Q.   This was not like a whodunit, correct?

A.   That is correct.

Q.   And it's fair to say that when you were interviewing him, he was the target of the investigation, correct?

A.   At that point he was the only one that was identified.

Q.   And you said you just wanted to get his side, correct?

A.   I wanted to speak with him, yes, before I guess anyone else would've had a chance to, which is that time crunch I was referring to from the school end of things.

Q.   And he initially said he didn't know why you wanted to talk to him, correct?

A.   Correct.  As soon as I walked into the -- and made the introductions, I asked him if he had any idea, and he said no.

Q.   Did you also tell him that he would be able to call his wife and get the kids out of the house if -- if he cooperated in answering your questions?

A.   I think we discussed that.  That was a large concern for his.  That phone call I don't think happened, however, that information was also relayed to my boss and coworkers who were the ones actually serving the warrant, and they took the necessary steps to communicate that with her before we really got onto the property.

Q.   Okay.  There's some documents, exhibits that we've marked that are in front of you.  They're not part of the binder, underneath there on top.  Do you see those?

A.   I got 'em.

Q.   I'd like you to look at Exhibit 101.  I just want to confirm, if you can look at the last page there, is that your signature as the affiant of the search warrant?

A.   Yes.

Q.   And did you help prepare or provide the D.A.'s Office with the information to provide in the probable cause statement, which is on Bates numbered page 121?

A.   I did, yes.

Q.   Okay.  And you would agree with me that paragraphs seven and eight, and you can read them or just tell me from your

memory, those were -- that was information that was provided in the interview room at the school from Mr. Schroeder, correct?

A.   Give me a second to read it.

Q.   Yeah.

A.   So paragraph eight, I guess --  To answer your question, paragraph eight identifies that it was based off the interview at the sheriff's office.  Paragraph seven was the -- what I'll say is like the beginning statements of the interview that would've taken place at the high school along with getting that information from the victim who was also at the high school.

Q.   Okay.  I guess I should've been a little bit more specific.  So in looking at these paragraphs, seven is information that took place in that initial room at the school, correct?

A.   Correct.

Q.   And then paragraph eight contains information that took place after that alleged waiver of the Miranda rights, correct?

A.   Correct.

Q.   Okay. All right.  And did you help prepare the other -- you'll see on exhibit -- there's Exhibit 103 and 102 in front of you.  If you go to 103, page 96 there on the Bates number, it appears like those --

A.   You said 96?

Q.   Yeah, 96.

A.   Which paragraph?

93

Q. So paragraphs five and six appear to be essentially the same or substantially the same, there's a little bit different wording like an addition of that, but they're essentially the same as paragraphs seven and eight in the previous exhibit, 101, that I showed you?

A. Correct, yeah, the substance is similar.

Q. Okay. And this was actually, there's some additional information or paragraphs here. Seven and eight, so seven says related to Schroeder admitting he intentionally hid photos under his Snapchat account. Do you see that?

A. Are we still on 103?

Q. Paragraph seven, sorry. The next page.

A. Of 103?

Q. Ninety-seven, I'm sorry, yes. Exhibit 103.

A. 103. Sorry.

Q. Yup. Bates page 97.

A. Correct.

Q. And that information, do you know if that came from which interview that -- that information came from, because it does not, at least to my eye, appear specific.

A. I believe we covered it in both. He provided me the My Eyes Only pass code, I guess the incorrect pass code in the first one, and then we covered it again when we were at the sheriff's office. I guess both is the way I could answer your question.

94

Q.   Gotcha.  Okay.  And paragraph eight is information that I believe was from the forensic interview?

A.   That is correct, yes.

Q.   Now, my question related to eight.  Is that information that was substantially similar to what you had received that you believe gave you probable cause to seize the phone when you initially encountered Mr. Schroeder?

A.   No.  So the initial information that I had to seize the phone came from G.K., the first victim at the school.

Q.   And just so that the Court can follow along with this, that was identified as victim two, correct?

A.   Correct.  In this --

Q.   In this document?

A.   Yes.

Q.   Okay.  So when we're talking about -- or you're talking about G.K., you're not talking about victim one even though victim one was disclosed after victim two, correct?

A.   Correct.

Q.   Okay.  So this was information that essentially you had initially received a lead, we'll call it, from Mr. Schroeder that there was another individual who is now identified as victim one, correct?

A.   Correct.

Q.   And that information came out in that interview at the school, correct?

95

A.   First at the school and then continued.

Q.   Correct.

A.   At the sheriff's office, yes.

Q.   Okay.  And then just to close the loop on this, I just have to be specific with this, so I'm not trying to belabor this, but if you can go to Exhibit 102, this is the search warrant for the house, and if you go to page 81, paragraph nine?

A.   Paragraph nine?

Q.   Yes.  So this is not specific as to the genesis of this information, but do you remember where you initially heard the information that you provided in paragraph nine of the search warrant affidavit?

A.   That would've been at this high school.

Q.   Okay.  Thank you.

A.   Is there another question?

Q.   That's it.

A.   Okay.

          MR. LUCZAK:  Let me just go through my notes just to make sure.  Okay.

          (There was discussion off the record.)

BY MR. LUCZAK:

Q.   So were you provided --  Did you ever talk directly to the District Attorney's Office while you were at the school?

A.   I believe all the conversations I had with the District

Attorney's Office were prior to me arriving while I was en route to the school, but I don't believe I called them after, I think everything was ran through my supervisor from that point, from the time I was at the school until we got back to the sheriff's office.

Q. Okay. And you would agree with me that ultimately you made the call to make the formal arrest, we'll call it, and escorting Mr. Schroeder out of the building, correct?

A. No. Couple different reasons. The main one being my supervisor and the District Attorney's Office told me not to. When I first got there, things obviously changed as we -- the conversation went on, so I needed to update my supervisor who I can't speak to if he communicated with the District Attorney's Office, but based on totality of the investigation at that point, we both felt comfortable of needing to take him into custody, which was different from, I guess, that was the difference from me initially getting to the school and using that information that Detective Brooks initially relayed.

Q. Okay. So I'm trying to figure -- Like we've watched Detective Brooks' body cam footage, which kind of cuts in and out, of the interview. Have you watched that?

A. Yes.

Q. Okay. At what point in time did you get or make that call to your supervisor and the direction was given to you, we're going to -- we're going to cuff him and -- or, I mean, you said

he wasn't cuffed, but we've heard some testimony that he was cuffed and taken out of the school. At what point in time in that series of events when the interview is going on did you have time to talk to your supervisor and then get that directive?

A. That would've been after, I guess I'll call it the conclusion of our conversation at the school. I left the room completely, made that phone call, and then that -- shortly thereafter is when the deputies would've arrived to transport him.

Q. Okay. So when you tell Brooks to stay, it's at that point that if -- I mean, you would agree with me at that point you're going to make the call to ask to, you know, formally arrest and take him out of the school, that at that point he was not free to leave that room, correct?

A. I don't think I told Brooks to stay, something to the effect of be in that -- be in the room with him while I make the phone call. He wouldn't have been aware of that communication that I was having with my boss, nor would he have been aware about him being in custody -- or Mr. Schroeder being in custody.

Q. Right. But, I mean, he's a smart guy, correct?

A. Yeah.

Q. And you tell him, hey, hang out here, I got to go do something, I mean, it's pretty obvious what you're doing,

98

correct? I mean, he knew the information that you were obtaining and he -- I mean, it's --

A. I don't -- I don't think it was obvious to Detective Brooks because he was not part of that conversation I was having with my supervisor, and I didn't tell him in any way, shape, or form or communicate with Detective Brooks about taking him into custody prior to me leaving that room.

Q. Right. But you'd agree as law enforcement officers, I mean, there's a lot of communication that can happen that is not verbal, correct?

A. Sure.

Q. And there's also communication where if you have worked with somebody or you know someone and you're trying to convey something to them, you may not say directly, hey, this is what I'm going to go do because you even said today that the reason you left him in there is because you were hopeful that he would continue talking, correct?

A. Rapport building, yes.

Q. Yeah. But you would agree with me that if you're on the phone and you're making that call and he walks out of that room, you obviously would have stopped him and put cuffs on him and not let him go, correct?

A. At that time, yes.

Q. Okay. Thank you.

MR. LUCZAK: No further questions.

99

THE COURT: Anything else from the Government?

MR. HUMBLE: No, Your Honor.

THE COURT: Excuse me.

EXAMINATION

BY THE COURT:

Q. Detective Steber?

A. Steber.

Q. When you took possession of the phone in that room, in the conference room at the school, did it remain in your sole possession all the way back to the police department and until it was logged as evidence after he was arrested and Mirandized?

A. Yes.

Q. Okay. When you went out, I think part of the video you're going out in the hall with the phone, you're following up with some other members of the department. Did anyone else ever have any access to the phone when you were not in the room as we see on the conference room camera?

A. No. It would've remained in my possession, specifically I think I had it zipped up in my binder that I was on video leaving the room with. It would've remained there all the way until I was able to get it entered into evidence at our sheriff's office that night.

THE COURT: Okay. Thank you. Thank you. That's all. I just wanted to clear that up for myself. You're excused.

100

And then, gentlemen, what is the status of the companion -- It's my understanding that in the state case, there is a -- there's also a motion to suppress.

MR. HUMBLE: There is.

MR. LUCZAK: Yes.

THE COURT: Okay. Have you -- Do we know when that's scheduled and do we know has there been communication with the state as to what they intend to do with their case?

MR. HUMBLE: Well, I believe the state prosecutor's here, Your Honor. As well as defense counsel for the state.

MR. LUCZAK: I'm here.

THE COURT: I don't want to put you on the spot as to what you're going to do with it right now, but that motion is still pending?

MS. SCARPELLI: Yes, it was filed after this one.

THE COURT: Okay.

MS. SCARPELLI: We had scheduled it within -- some time after the first of the year --

THE COURT: For the hearing? Okay. And then, and I do want to clear this up, it's Schroeder or Schroeder?

THE DEFENDANT: Schroeder.

THE COURT: Schroeder. Mr. Schroeder, you have not testified here today, and I just want to clarify that you understand that you did have the right to testify with respect to this motion? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And have you discussed that decision not to testify with your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And it's your decision not to testify during this hearing?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Thank you. Okay. So we're going to take all this under advisement. It's my understanding is the Government planning to file what I have in terms of written briefing is the motion that was filed by the defendant. We didn't set up a briefing schedule for that and what we're going to do there. How do you guys envision this going forward? Because what I plan to do is review the evidence from this hearing, the motion that's already been filed, and then have us issue a -- we'll issue a written decision. How much time do you need?

(There was discussion off the record.)

MR. HUMBLE: Is the Court open to simultaneous briefing?

THE COURT: Sure.

MR. HUMBLE: Because, I mean, we each carry certain burdens with respects to certain aspects.

THE COURT: Right.

MR. HUMBLE: So if the Court's open to simultaneous

October 20, 2025

briefing, I think that's good.  Your Honor, perhaps, and perhaps Mr. Court Reporter knows, how long it will take to get the transcript if we could get set a briefing schedule for when we receive the transcript?  Or when the Court receives the transcript?

THE COURT:  And you guys feel that the transcript is necessary for the briefing?

MR. HUMBLE:  I think --

MR. LUCZAK:  I think so.

THE COURT:  Why?  What was uncovered today that came up that wasn't already in the videos and that we don't -- didn't know?

MR. LUCZAK:  Well, I -- the probable cause, but I mean, the fact that there was a belief that there was probable cause to seize the phone, it was not -- I mean, at least by my estimation, that is a new fact that came out in this motion hearing, which I have to kind of evaluate how that affects kind of the analysis, if at all.

THE COURT:  All right.  Well, if you guys -- if you think you need the transcript, I'm not going to deny you the ability to incorporate that into your briefs.  What does that do to the time frame?

THE REPORTER:  Tell me when you want it, you'll have it.

MR. LUCZAK:  Okay.  In a couple weeks?

Case 1:25-cr-00103-BBC    Filed 10/24/25    Page 103 of 106    Document 18

THE REPORTER: (Nods head.)

THE COURT: So could we have the -- And then how much time do you think you'd need after you get the transcript for simultaneous briefing, 14 days?

MR. LUCZAK: Could we have 21 days?

THE COURT: Twenty-one days from the time you get the transcript, and you expect the transcript in 10 days? Is that agreeable with everybody?

MR. LUCZAK: Yes.

MR. HUMBLE: Sure.

THE COURT: Okay.

MR. LUCZAK: And will we be required to file replies or will we file -- I mean, if -- if we feel that it's necessary or not, we can notify the Court or -- I don't know what your preference is.

THE COURT: Well, it would be a response.

MR. LUCZAK: Yeah, a response. I'm sorry.

THE COURT: If somebody feels that they need to file something in response, I would say let's limit that to four pages.

MR. LUCZAK: Okay.

THE COURT: I mean, you know, a lot of this is what it is on the evidence that we have on the transcript.

MR. LUCZAK: Right.

THE COURT: And the video.

104

MR. LUCZAK:  Yup.

THE COURT:  So 10 days and 21 days to -- from receiving the transcript and then 14 days for a response?

MR. LUCZAK:  Okay.

THE COURT:  Okay.  Is there anything else that we need to cover today from the Government?

MR. HUMBLE:  No, Your Honor.

THE COURT:  Mr. Luczak?

MR. LUCZAK:  No.  Thank you.

THE COURT:  All right.  Thank you, everybody.  We're adjourned.

(At 4:13 p.m. the hearing ended.)

Case 1:25-cr-00103-BBC    Filed 10/24/25    Page 105 of 106    Document 18

C E R T I F I C A T E

I, THOMAS A. MALKIEWICZ, RPR, RMR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcript of all the proceedings had and testimony taken in the above-entitled matter as the same are contained in my original machine shorthand notes on the said trial or proceeding.

Dated this 23rd day of October, 2025.

Milwaukee, Wisconsin.

Thomas A. Malkiewicz, RPR, RMR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 236
Milwaukee, WI 53202

Thomas_Malkiewicz@wied.uscourts.gov

ELECTRONICALLY SIGNED BY THOMAS A. MALKIEWICZ
Official U.S. Reporter, RPR, RMR, CRR
_____

106