UNITED STATES OF AMERICA,

      Plaintiff,

    v.                                Case No. 25-CR-103

RYAN S. SCHROEDER,

      Defendant.

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by its attorneys, Brad D. Schimel, United States Attorney for the Eastern District of Wisconsin, and Daniel R. Humble and Timothy W. Funnell, Assistant United States Attorneys for said district, respectfully submits this brief in opposition to Schroeder's motion to suppress statements and derivative evidence. (ECF 11) Although it is unclear from Schroeder's motion whether and to what extent he raises a separate Fourth Amendment challenge to the search and seizure of his phone, this response addresses it as well.

For the following reasons, the Court should deny Schroeder's motion and find that (i) no *Miranda* warnings were required during Schroeder's non-custodial, voluntary interview with Detective Steber in the school-district conference room; (ii) Steber lawfully seized Schroeder's phone at the school based on probable cause that it contained evidence of a crime; (iii) Steber did not search Schroeder's phone at the school, instead, he merely placed it in airplane mode to preserve evidence;

(iv) Steber first searched the phone at the Sheriff's Department, after obtaining Schroeder's valid consent; and (v) Schroeder knowingly and voluntarily waived his *Miranda* rights before his custodial interview at the Sheriff's Department, where he again made voluntary statements to Steber.

## I.     Background

On May 20, 2025, a grand jury in this district indicted Schroeder on two counts of producing child pornography, in violation of Title 18, United States Code, Section 2251(a). The charges arose from Schroeder's tenure as a teacher and track coach at Mishicot High/Middle Schools, when he allegedly enticed a minor student (R.M.)[1] to create and send him sexually explicit images of herself (also called child sexual abuse material or "CSAM"). (ECF 1)

Schroeder has since filed a motion to suppress his statements to law enforcement and any derivative evidence. (ECF 11) On October 20, 2025, the Court held an evidentiary hearing on Schroeder's motion where it received 17 exhibits and heard testimony from three witnesses presented by the government: Detective James Brooks of the Village of Mishicot Police Department, Detective Ryan Steber of the Manitowoc County Sheriff's Department, and Mishicot Public School Superintendent Cory Erlandson. (ECF 18; Exhs. 1-17). The exhibits comprised investigative reports prepared by Brooks and Steber (Exhs. 12A, 13), pictures of the school-district conference room (Exh. 14), Steber's audio-recorded interview of Schroeder in the

---

[1] As made clear at the evidentiary hearing, the investigation revealed that Schroeder allegedly victimized two minor students: R.M. and G.K. The two-count indictment is limited to Schroeder's alleged production of child pornography involving R.M., whom the indictment refers to as Jane Doe A.

school's conference room (Exhs. 1-2), Brooks's bodycam videos at the school (Exhs. 6-8), videos of Schroeder's subsequent interview by Steber at the Sheriff's Department (Exhs. 3-5), Schroeder's signed *Miranda* waiver (Exh. 9), Schroeder's signed consent-to-search form (Exh. 10), and screenshots from Schroeder's phone (Exhs. 15-17).

## II. Statement of Facts[2]

### A. Schroeder's interview in the school-district conference room

On April 16, 2025, just after 1:00 p.m., Detective Brooks was told by his police chief to respond to the Mishicot High School/Middle School complex. (ECF 18 at 10; Exh. 12-A) At the time, Brooks knew little about the nature of the complaint, only that school officials had requested law-enforcement assistance, and that Child Protective Services may get involved. (ECF 18 at 10-12; Exh. 12-A at 1) Brooks arrived around 1:20 p.m. and met with school officials, including Superintendent Erlandson, who testified at the hearing. School officials told Brooks that G.K.—a 13-year-old 7th-grade student—reported that she and Schroeder—the school's gym teacher and track coach—had been exchanging inappropriate images of each other. (ECF 18 at 13-14; Exh. 12-A at 1)

Brooks then interviewed G.K., starting at about 1:55 p.m. (ECF 18 at 14; Exh. 12-A at 1) G.K. reported that she and Schroeder had been exchanging text messages and then transitioned to Instagram messages around the time of spring break, March 17-23, 2025, including sexually suggestive texts and images of each other. G.K. sent

---

[2] The facts are taken from sworn testimony and exhibits introduced at the evidentiary hearing, where Schroeder did not testify. To the extent that Schroeder's initial motion contained factual assertions without reasonable support in the record, including that Det. Steber searched through Schroeder's phone at the school, the Court should reject them.

pictures of herself in a bra and underwear, and in Spandex-type shorts that Schroeder said were "hot," and Schroeder sent G.K. pictures of his "abs" and an estimated eight images of his penis. (ECF 18 at 15; Exh. 12-A at 1-2) G.K. suspected that Schroeder took the explicit pictures at his home based on the physical surroundings. (Exh. 12-A at 1) G.K. also reported that they had hugged a couple times at school, that Schroeder asked her several times to come to his room at the school, and that they planned to meet during spring break to have oral and anal sex, but it never occurred. (ECF 18 at 46-47; Exh. 12-A at 1) G.K. had deleted the images from her phone, which she showed to Brooks, who saw Schroeder's contact information saved under "Emma," and G.K.'s Instagram account where Schroeder's username was "Emma7853268." (ECF 18 at 15-16; Exh. 12-A at 1-2)

Based on the interview with G.K., Brooks knew the investigation required several follow-up steps, including an off-site forensic interview of G.K. at the Child Advocacy Center, drafting and executing a search warrant for Schroeder's house, obtaining and searching Schroeder's phone, and—if Schroeder agreed to it—an interview with Schroeder. (ECF 18 at 14-15; Exh. 12-A at 1) Brooks also knew from school officials that Schroeder would likely be placed on administrative leave at 3:00 p.m. (ECF 18 at 13-14; Exh. 12-A at 1)

Given these tasks and the timeline, Brooks requested assistance from Lt. Brett Oswald of the Manitowoc County Sheriff's Office. (ECF 18 at 14; Exhs. 12-A, 13 at 1) Oswald agreed and sent MCSO Det. Ryan Steber to the school for an attempted interview with Schroeder. (Id.) Meanwhile, Oswald would be assisting by obtaining a search warrant for Schroeder's house using the information relayed to him by Brooks

and Steber. Brooks and Steber were told by Oswald and the state prosecutor not to arrest Schroeder based solely on the initial information learned from G.K.; instead, they were told to wait until G.K.'s forensic interview, which was to happen later that evening. (ECF 18 at 14-15, 29, 31, 72-73; Exh. 12-A at 1-2)

On his way to the school, Steber was apprised of the background facts, and upon arrival, he met with Brooks, school officials, and G.K. (ECF 18 at 57-59; Exh. 13 at 1) Thus, prior to interviewing Schroeder, Steber and Brooks knew the substance of G.K.'s allegations about the sharing of sexually suggestive messages and images, including multiple images showing Schroeder's penis. (Id.)

After meeting with Brooks and G.K., Steber asked Superintendent Erlandson to locate Schroeder and bring him to the school-district conference room for an interview. (ECF 18 at 59; Exh. 13 at 1) Erlandson testified that he did so, taking along a principal to cover Schroeder's class. (ECF 18 at 48-49.) Erlandson said it wasn't uncommon for him to "pop down and pull a teacher out of the classroom," and that he had done so before with Schroeder. (ECF 18 at 48-49).

Erlandson testified that they didn't discuss where they were going and why, or anything related to Schroeder's job or potential discipline. (Id.) Schroeder's only question was to use the restroom, and after he did, he was left unattended in the school-district conference room. (ECF 18 at 48-50). As shown in the videos and pictures introduced at the hearing, the room had a typical conference-style table and chairs and two entry/exit doors, one of which opened to a hallway that was commonly used by staff and students, as it was during the ensuing interview. (ECF 18 at 11, 18, 26; Exh. 14 at 1-7)

Shortly thereafter, at about 3:00 p.m., Brooks and Steber entered the conference room where Schroeder was waiting and standing. (ECF 18 at 60; Exh. 6 at 15:00) Steber introduced himself, said "have a seat buddy," and they shook hands, both men taking seats at the table. (Id.) Steber was wearing cargo pants and a fleece zip-up that covered his badge and firearm. (Id.) Brooks stood by the door, and as the testimony and bodycam videos indicate, he left several times during the interview.

Steber began by saying they needed to talk, and Shroeder replied "sure." (Exhs. 6 at 15:00, 13 at 1) Steber then asked him, "What about? What would prompt you to be talking to a detective with the Sheriff's Office and Detective Brooks of the Mishicot PD?" (Id.) When Schroeder didn't offer anything, Steber replied, "Nothing at all? I think you do." (Id.) Steber said "we all make mistakes" and encouraged Schroeder to "get in front of it." (Id.) Schroeder agreed, replying "sure," "yep," and "sure." (Id.) Steber continued, "I do this for a living, I cast no judgment, and I will work with you as long as you're going to work with me, sound good?" (Id.) Schroeder replied, "Sounds good sir." (Id.)

Because Steber already had probable cause that Schroeder's phone contained evidence of a felony based on G.K.'s allegations,[3] Steber said that first he needed Schroeder's phone. (ECF 18 at 61; Exhs. 6 at 15:00, 13 at 1) Schroeder asked, "What for?", and Steber replied, "Because I'm going to take it." (Id.) Schroeder handed it to Steber, who also asked for Schroeder's iWatch, which he turned over as well. (Id.)

---

[3] Section 948.11(2)(a) of the Wisconsin Statutes makes it a Class I felony to knowingly distribute a sexually explicit image to a child. The statute also served as the basis for the warrant to search Schroeder's house. (Exh. 102)

Steber explained that it was an investigation into electronics and asked for the phone's passcode. (Id.) Schroeder didn't answer the question either way, instead pausing for a few seconds with his head in his hands before asking if they could "just talk quick." (ECF 18 at 61; Exhs. 6 at 15:00, 13 at 1-2) Steber agreed, saying that's why they were there. (Id.) Several minutes of discussion ensued, where Steber encouraged Schroeder to tell the truth and not to lie. (Id.)

At no time did Steber make any threats, touch Schroeder, or physically intimidate Schroeder in any way. Steber made no specific promises, saying only that he wanted Schroeder to cooperate and would work with Schroeder. (ECF 18 at 64-65; see also Exhs. 1-2, 6-8, 13)

Over the next few minutes, as Steber questioned him, Schroeder admitted to exchanging sexually suggestive messages and images with G.K. over Instagram, including pictures of his penis. (Exhs. 6 at 15:03-15:06, 13 at 2.) When Steber pressed Schroeder on any additional images that may be on his phone, including "child pornography," Schroeder asked what he was "looking at" and "what's next." (Exh. 6 at 15:08, 13 at 2) Steber said that it's a "criminal offense," and when "we get done with the interview," a search warrant would be done at Schroeder's house among other things. (Exhs. 6 at 15:08-15:10, 13 at 2) Schroeder asked, "So like am I going to jail tonight, or like what?" (Exh. 6 at 15:10) Steber replied that he didn't know, there were other "moving pieces," and he needed to call his supervisor to discuss things including Schroeder's cooperation. (Exh. 6 at 15:10 to 15:13)

When Steber returned to the topic of whether any other images would be on Schroeder's phone, Schroeder asked if Brooks could leave the room first. (ECF 18 at

7

61; Exhs. 6 at 15:14, 13 at 2) Brooks agreed, leaving the room at about 3:14 p.m. so that Schroeder could talk privately with Steber. (Id.)

With Brooks gone at Schroeder's request, Schroeder revealed that in addition to G.K., there was another female student involved, R.M. (ECF 18 at 63-65; Exhs. 1 at 13:40 to 14:30, 13 at 2) This was new information to Steber, a fact that he didn't share with Schroeder, instead telling Schroeder not to assume what Steber knew or didn't know. (Id.) Schroeder continued, talking about both G.K. and R.M., but Steber re-directed him so they could finish their discussion about G.K. (Id.) In that regard, Schroeder admitted that he had sent 10-15 pictures of his penis to G.K. via Instagram, and that G.K. had sent him about 10 sexually explicit pictures of herself on the same platform. (Exhs. 1 at 14:30 to 18:00, 13 at 2)

Brooks re-entered the conference room at about 3:18 p.m., and Steber still had not obtained the passcode for Schroeder's phone. (Exh. 7 at 15:18) Brooks listened to the conversation for several seconds before interrupting to tell Steber that he had spoken with Steber's "boss" (Oswald) and wanted to know if the phone contained "CSAM." (ECF 18 at 21-22, 68-69; Exh. 7 at 15:18-15:19) Steber answered "yes," and when Brooks asked a follow-up question of whether Steber had "viewed" it, Steber said "not yet"—since his knowledge of the CSAM on the phone came from Schroeder himself, not from a search of the phone, which hadn't occurred. (Id.) Brooks then got a call from Oswald, so he stepped out again to relay the information. (Id.)

Steber and Schroeder kept talking, and Brooks reentered about 3:20 p.m. (Exh. 8 at 15:20) As Schroeder continued describing how he had sexually assaulted R.M., Steber again asked for the phone's passcode, which Schroeder immediately provided,

saying "0420." (ECF 18 at 66; Exhs. 8 at 15:24, 13 at 3) Steber still did not search the phone at the school after receiving the passcode. (Id.) Instead, he followed his department's guidance by entering the passcode to confirm its validity, and he put the phone in "airplane mode" to preserve evidence, preventing Schroeder or anyone on his behalf from wiping its contents remotely. (ECF 18 at 66-68, 81; Exh. 17)

Because Schroeder admitted to messaging and exchanging images with R.M. using Snapchat's "My Eyes" feature, Steber asked for that passcode as well. (ECF 18 at 24-25; Exhs. 8 at 15:26, 12-A, 13 at 3) Schroeder said "113810," which Steber couldn't have successfully used even if he had tried, because as he later learned at the Sheriff's Department, Schroeder had mistakenly given him the wrong code. (ECF 18 at 70-71; Exh. 10) The correct code for his Snapchat was only four digits—"1138"— as Steber corrected on the consent form by scratching out the last two digits of the six-digit code Schroeder had provided at the school. (Id.)

Returning to the school interview, at about 3:27 p.m., Steber told Schroeder that he would be pausing to speak to his supervisor (Lt. Oswald), and he asked Brooks to "hang out" in the room while he was gone. (ECF 18 at 71-72; Exh. 8 at 15:27) While Steber was out of the room, Brooks—whose bodycam was on—stood silent until about 3:29 p.m., when Schroeder began asking questions about where he could go that night if he didn't go to jail. (ECF 18 at 26-27; Exh. 8 at 15:29) Brooks essentially replied that those arrangements were up to Schroeder. (Id.) That was their only exchange, and at about 3:38 p.m., Steber reentered with two uniformed officers, telling Schroeder—for the first time—that he would be taken into custody and transported to the station. (ECF 18 at 29, 74; Exh. 8 at 15:38)

9

Until that point, about 38 minutes after the interview began, neither Steber nor Brooks had told Schroeder that he was detained or under arrest, they had not placed him in handcuffs or physically touched him, and at all times, their tone was conversational without yelling or raising their voices. (ECF 18 at 25; see generally Exhs. 1-2, 6-8) To be sure, Schroeder showed signs of nervousness and discomfort during the interview, but his overall demeanor was measured, he was coherent, and he showed no signs of intoxication or mental impairment. Schroeder did not ask to leave or stop the questioning, nor did he make any attempt to do so.

During their testimony, Brooks and Steber explained that while they had planned to follow instructions from Oswald and the state prosecutor not to arrest Schroeder based solely on the initial information obtained from G.K., the circumstances had changed significantly. (ECF 18 at 27-30, 72-73, 97-99) Namely, Steber obtained incriminating statements about messages and images directly from Schroeder, and after Steber conferred with Oswald about this new information, they determined that an arrest would be made. (ECF 18 at 72-73, 97-99) Even then, Steber continued dealing with Schroeder in a measured, respectful manner, telling Schroeder that based on his cooperation, they would handcuff him and escort him from the school grounds in the most low-key manner possible to minimize visibility. (ECF 18 at 74-75; Exh. 2 at 2:00)

### B.    Schroeder's interview at the Sheriff's Office

After Schroeder was transported to the Manitowoc County Sheriff's Office, he was unhandcuffed and placed in a "soft interview" room as Steber described it, having cushioned chairs, a lamp, and an end table. (ECF 18 at 76; Exhs. 3-5). As Schroeder

10

waited there for Steber, the door remained open, with a uniformed officer nearby in the hallway. Early on, Lt. Oswald entered to introduce himself and see if Schroeder needed anything. (Exh. 3 at 6:45) Oswald said they appreciated Schroeder being "open and honest," and asked if it was "fair" for Steber to come and talk to Schroeder some more. (Id.) Schroeder agreed. (Id.) While Schroeder waited, he was provided a glass of water and allowed to use the restroom when he asked. (Exh. 3 at 4:00, 30:30 to 34:00)

Steber later joined Schroeder in the room, leaving the door open as they talked. (ECF 18 at 77; Exh. 3 at 36:00; see also Exhs. 4-5) Steber said there were probably many things on Schroeder's mind, and Schroeder replied that whatever comes his way, he deserves it. (Exh. 3 at 37:00 to 37:45) Steber acknowledged Schroeder's sentiment, and told him that since he was transported there, he needed to be advised of his "*Miranda* rights." (Exh. 3 at 37:45 to 39:05) Steber read the *Miranda* warnings aloud to Schroeder from a standard form and asked Schroeder if he understood them, with Schroeder replying yes. (Id.) Later, when Steber went over the consent form to search Schroeder's phone, Steber also presented him with the *Miranda* waiver form. Schroeder signed them both. (ECF 18 at 77-78; Exhs. 4 at 11:30, 9-10, 13 at 4, 7)

Following Schroeder's *Miranda* waiver, he provided Steber a detailed version of his conduct with G.K. and R.M. (ECF 18 at 77; Exh. 3 at 39:00 et seq.; see also Exhs. 4-5) Schroeder also handwrote an apology for his actions. (Exh. 11)

Throughout the interview at the Sheriff's Office, just as it had been during the interview at the school, the interaction between Steber and Schroeder was conversational, with Steber encouraging cooperation but making no specific promises,

with no threats or physical coercion, and Schroeder showed no signs of intoxication or mental impairment. (See Exhs. 3-5)

## III.   Argument

### A.   Applicable law on *Miranda* warnings and voluntariness.

Schroeder moves to suppress the statements he made to Steber and any evidence derived therefrom, claiming that his *Miranda* rights were violated and his statements were involuntary.

"The government has the burden of demonstrating that a confession is admissible, and must prove by a preponderance of the evidence a defendant's waiver of his *Miranda* rights and the voluntariness of the confession." *United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012).

*Miranda* held that to protect the privilege against self-incrimination, officers must warn suspects during "custodial interrogations" about their rights to silence and counsel and obtain a knowing and voluntary waiver of those rights. *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda*, therefore, is implicated only when there is both custody and interrogation. *Id.* (citing *Miranda*, 384 U.S. at 445; and *Berkemer v. McCarty*, 468 U.S. 420, 437–38 (1984)).

Because the government concedes that Schroeder was interrogated during both interviews, the disputed issues are custody, waiver, and voluntariness.

Again, because *Miranda* warnings are triggered only by "custody," they "are not required in every instance of questioning by law enforcement." *Patterson*, 826 F.3d at 454 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*Miranda* warnings

are not required "simply because the questioning takes place in the [police] station house, or because the questioned person is one whom the police suspect").) The totality of circumstances is considered when deciding custody. *Id.* at 455. "As the Supreme Court [has] noted, '[a]ny interview of one suspected of a crime . . . will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" *Id.* at 459 (quoting *Mathiason*, 429 U.S. at 495)). "But not all interactions implicate *Miranda*." *Id.*

"As [the Supreme Court] has repeatedly emphasized, whether a person is 'in custody' is an objective inquiry," so the "subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *J.D.B.*, 564 U.S. at 270 (cleaned up); see also *United States v. Weiss*, 153 F.4th 574, 581 (7th Cir. 2025) ("The [suspect's] subjective belief is not relevant . . . [and] a policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time.") (quoting *Berkemer*, 468 U.S. at 441-42).)

Two areas are critical to the custody determination: "(1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.*, 564 U.S. at 270. Relevant factors include the location of the questioning, with public places weighing against custody; the duration of questioning; whether the suspected consented to questioning; statements made during the interview; use of physical restraints; whether officers told the suspect he was not under arrest and was free to leave; whether there was a threatening presence of several officers and a display of

13

weapons or physical force; whether officers used a commanding tone of voice; and releasing the suspect at the end of questioning. *Howes v. Fields*, 565 U.S. 499, 509 (2012); *Patterson*, 826 F.3d at 455.

As to the waiver of *Miranda* rights, the "inquiry has two distinct dimensions: waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (cleaned up). *Miranda* "does not impose a formalistic waiver procedure," so the government "does not need to show that a waiver of *Miranda* rights was express," and an "implicit waiver" is sufficient. *Id.* at 384-85. In sum, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384.

"A statement is voluntary if, in light of the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Ambrose*, 668 F.3d at 955 (quoting *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011)). "Coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Id.*

"In assessing voluntariness, courts must weight the tactics and setting of the interrogation alongside any particular vulnerabilities of the suspect." *Dassey v. Dittman*, 877 F.d 297, 303 (7th Cir. 2017) (citing *Schneckloth v. Bustamonte*, 412 U.S.

218, 226 (1973). "Relevant factors include the suspect's age, intelligence, and education, as well as his familiarity with the criminal justice system." *Id.* (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

### B. Schroeder's interview at the school was non-custodial and voluntary.

During questioning at the school, Schroeder was not "in custody" because he was not formally arrested or restrained in a manner equivalent to formal arrest.

Steber questioned Schroeder in the benign setting of a school-district conference room with two entry/exit doors and garden-variety office furnishings. The interview was in a public building, not a police station or squad car, and viewed objectively, staff members like Schroeder would know it well and be comfortable there since they go there every workday. The doors were shut, but that's typical for conference rooms, especially those with a well-used public hallway outside the door where students and staff are on-site and can be expected to walk by. A reasonable person would not feel confined or experience any "aspect of isolation" in this setting. See *Ambrose*, 668 F.3d at 957 (observing that the "ease of leaving" a public-setting interview "limit[s] the coercive impact," and affirming as non-custodial an interview in a secure FBI building "that was [held] an active floor with many people and thus there was no aspect of isolation," and where the conference "room itself did not physically prevent Ambrose's exit, nor did it suggest that he was under arrest").

Throughout the interview, Schroeder was never handcuffed, and while he wasn't told that he could leave, no one told him that he was detained, under arrest, or not free to leave. See *Patterson*, 826 F.3d at 458 ("Here, Patterson stresses the

agents never explicitly told him he was not under arrest or that he was free to leave. But this argument cuts both ways; Patterson was never told he *was* under arrest.") (emphasis in original)). Early in the conversation, rather than leaving or signaling an intent to leave, Schroeder showed his willingness to stay and answer questions, asking Steber: "Can we just talk quick?" in response to a request for his cell phone's passcode. Likewise, school officials said nothing to Schroeder that could have contributed to a restrictive atmosphere. Superintendent Erlandson, who was the only one to interact with Schroeder before the interview, didn't say where they were going and why, and Schroeder didn't ask.

Put simply, this was not a law-enforcement-dominated atmosphere, and findings of non-custody for *Miranda* purposes are routinely affirmed in situations with more law-enforcement control than presented here. *Berkemer*, 468 U.S. at 440 (ordinary traffic stops do not trigger *Miranda* custody); *United States v. Khan*, 937 F.3d 1042, 1053 (7th Cir. 2019) ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.") (quoting *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010)); *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996) (holding suspect was not in custody for *Miranda* when he was questioned in the back of a patrol car about drugs and a weapon while his car was searched).

In *United States v. Weiss*, 153 F.4th 574 (7th Cir. 2025), FBI agents had a search warrant for Weiss's person and cell phone, and after watching him drive away from his house, they activated their vehicle's lights, pulled him over, said they "needed" to speak with him, and questioned him inside their vehicle for an hour and

16

40 minutes. The district court found it non-custodial, and the Seventh Circuit affirmed, citing several factors: they stopped him on a public street, did not order him out of the car or handcuff him, told him that he was not under arrest, and the duration was "largely attributable to [his] cooperation." *Id.* at 581-82.

In *United States v. Budd*, 549 F.3d 1140, 1145-46 (7th Cir. 2008), officers asked Budd—a child-pornography suspect—if he would come to the police station to be interviewed. Budd agreed, and the interviews occurred over three different days, with officers driving Budd back and forth multiple times and searching his house between the first and second interview. *Miranda* warnings were not given, but the finding of non-custody was affirmed where officers told Budd the interviews were voluntary, they questioned him in a "soft" interview room, their tone was "very calm," they carried firearms but wore plain clothes and never made a show of force, and they never handcuffed him until he was formally arrested. *Id.*

As to duration, the questioning here lasted just over 35 minutes. In addition to *Weiss*, supra, the Supreme Court and the Seventh Circuit have consistently affirmed findings of non-custodial interviews lasting much longer. *Beckwith v. United* States, 425 U.S. 341, 347-48 (1976) (three hours); *United States v. Valley*, 755 F.3d 581, 583 (7th Cir. 2014) (five-and-a-half hours); *United States v. Scheets*, 185 F.3d 829, 842 (7th Cir. 1999) (under three hours); *United States v. Hocking*, 860 F.2d 769, 773 (7th Cir. 1988) (three hours); *see also Howes*, 132 S Ct. at 1193 (noting five to seven hours only lent "some support" to the custodial argument).

Only two officers—Steber and Brooks—were present for Steber's questioning at the school, and much of the time, it was just Steber. Indeed, Brooks left the room

once *at Schroeder's request*. Likewise, Steber and Brooks were calm and businesslike, not commanding in tone or demeanor. See *Ambrose*, 668 F.3d at 957-58; *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011); and *Budd*, 549 F.3d at 1145 (indicating the relevance of interviews that were calm, businesslike, non-hostile, and non-combative) While Steber periodically challenged Schroeder and encouraged him to cooperate, those statements did not—in tone or content—create the coercive, law-enforcement dominated atmosphere that animated *Miranda*'s prophylactic rule. Schroeder demonstrated his own measure of control by asking Brooks to step out, a request that was readily accommodated.

Also, Steber and Brooks planned not to arrest Schroeder based on directions from supervisors. However, as they testified, those circumstances changed significantly once Schroeder gave incriminating statements about his conduct towards G.K. and R.M.—a previously unknown second victim. While officers' subjective beliefs and unexpressed intentions are generally irrelevant to the objective inquiry of custody, the Court can and should consider that their plan not to arrest Schroeder made it more likely that they would objectively manifest the same intent.

For the foregoing reasons, the record proves that *Miranda* was not triggered during the in-school interview because Schroeder was not in custody. The record is equally clear that his statements during the interview were voluntary. As indicated above, "[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary," *Ambrose*, 668 F.3d at 955; see also *Dassey*, 877 F.3d at 303 ("First, a person arguing his confession was involuntary must show that the police engaged in coercive practices.")

Schroeder has made no such showing. His questioning had no hallmarks of physical force or intimidation, mental exhaustion, or deceit that could have overborne his will. At most, Steber encouraged him to cooperate, but even with juvenile suspects, "the Supreme Court allows police interrogators to tell a suspect that a 'cooperative attitude' would be to his benefit." *Id.* at 304 (quoting *Fare v. Michael C.*, 442 U.S. 707, 727 (1979). In sum, Schroeder was a well-educated adult with no particular vulnerabilities, he was aware of the circumstances, and he made the statements to Steber voluntarily.

C.   **Schroeder made voluntary statements at the Sheriff's Office after knowingly and voluntarily waiving his *Miranda* rights.**

As set forth above, the record proves that before Steber questioned Schroeder at the Sheriff's Office, Steber read the *Miranda* warnings aloud, Schroeder verbally acknowledged that he understood them, and Schroeder then made uncoerced statements without invoking his right to silence or counsel. This is sufficient to demonstrate Schroeder's valid *Miranda* waiver. *Berghuis*, 560 U.S. at 382-84.

The circumstances also show that Schroeder's statements were voluntary. Throughout the post-arrest interview, Schroeder was unhandcuffed in a "soft" interview room, allowed frequent bathroom trips, provided with a glass of water, and questioned by one officer—Steber—who made no threats, exercised no physical force, and continued using the same conversational demeanor that he previously exhibited at the school. Schroeder has failed to demonstrate the requisite coercive police activity needed for a finding of involuntariness.

**D.**   **Steber did not search Schroeder's phone at the school, instead, he waited until Schroeder gave consent at the Sheriff's Office.**

As discussed above, Schroeder's initial motion—filed before the evidentiary hearing—alleged that Steber searched Schroeder's phone at the school by "scrolling through his Snapchat account" and "then directed his interrogation using the information he had illegally obtained and further avoided advising Mr. Schroeder of his rights, and only then did law enforcement obtain his consent to search the contents of the phone." (ECF 11 at 16)[4] However, the record at the hearing proved that no search occurred at the school. Instead, based on the testimony of Brooks and Steber, corroborated by Brooks's bodycam videos, Steber simply placed the phone in "airplane mode" at the school and waited to search it until he obtained Schroeder's consent at the Sheriff's Office. (ECF 18 at 21-22, 66-68; Exh. 7 at 15:18-15:19)

Recall that when Brooks re-entered the conference room at about 3:18 p.m., Steber had not yet obtained the passcode for Schroeder's phone. (Exh. 7 at 15:18) Brooks interrupted to tell Steber that Brooks had spoken with Lt. Oswald, and Brooks asked if the phone contained "CSAM." Steber said "yes," but when Brooks asked whether Steber had "viewed" it, Steber said "not yet"—because he had not searched it and was relying on Schroeder's admission that CSAM images were there. (Id.) Brooks again left the room and reentered about 3:20 p.m. (Exh. 8 at 15:20) Shortly thereafter, Steber again asked for the phone's passcode, which Schroeder provided for the first time. (ECF 18 at 66; Exhs. 8 at 15:24, 13 at 3) Steber then had the code

---

[4] Schroeder's motion also alleged that he "will testify [at the hearing] that he would not have given his consent to search his phone had he been advised on his right to refuse, and to seek law enforcement to obtain a warrant to search it." (ECF 11 at 16-17) Because Schroeder failed to testify, his assertions have no support in the record.

20

but still did not search the phone, instead entering the code to confirm its validity and putting the phone in "airplane mode" to preserve evidence. (ECF 18 at 66-68, 81; Exh. 17) Further, as shown by Steber's testimony, his report, the Sheriff's Office video, and the consent form, Steber waited until the post-*Miranda* interview at the Sheriff's Office to ask Schroeder for consent to search the phone. Schroeder readily agreed, affixing his signature to the form. (ECF 18 at 77-78, 81-82; Exhs. 4 at 11:30, 10, 13 at 4, 7, 15) The only question surrounding the search of the phone, therefore, is whether Schroeder gave valid consent at the Sheriff's Office.

"[C]onsent is an exception to the Fourth Amendment's warrant requirement," and "for consent to be valid, it must be 'freely and voluntarily given.'" *United States v. Coleman*, 154 F.4th 558, 561 (7th Cir. 2025) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

"Courts assess the voluntariness of consent by considering the totality of the circumstances," and "[p]ertinent factors often include, but are not limited to, (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent." *Coleman*, 154 F.4th at 558 (cleaned up).

nsented. The government notes Jones had a GED and extensive interactions with the criminal justice system, suggesting he understood he could refuse consent. While the government contends "the record is unclear" as to whether the officers

informed Jones of his right to refuse consent, it is more accurate to say that the suppression hearing transcript is completely silent on this point.

"[O]fficers are not required to inform individuals of their right to refuse consent and that consent need not be in writing." *United States v. Jones*, 22 F.4th 667, 676 (7th Cir. 2022) (citing *Bustamonte*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.")). "It does not matter that officers sometimes use consent forms or go into greater detail about an individual's rights." *Id.*

Considering these factors and the circumstances of Schroeder's consent, the Court should readily find that it was valid. At the time of giving consent, Schroeder was a well-educated adult, he showed no signs of physical or mental impairment or intoxication, he had been fully apprised of his *Miranda* rights and waived them, he had not been threatened, coerced, or tricked, and he signed a consent-to-search form that explained in plain language the scope and purpose of the search and his right to refuse consent. (ECF 18 at 77-78, 81-82; Exhs. 4 at 11:30, 9-10, 13 at 4, 7, 15)

### Conclusion

Based on the evidence presented at the motion hearing and arguments above, the Court should deny Schroeder's motion to suppress.

Dated at Green Bay, Wisconsin this 20th day of November, 2025.

Respectfully submitted,

BRAD D. SCHIMEL
United States Attorney

By: *s/Timothy W. Funnell*
TIMOTHY W. FUNNELL
Assistant United States Attorney

*s/ Daniel R. Humble*
DANIEL R. HUMBLE
Assistant United States Attorney

Attorneys for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
205 Doty Street, Suite 301
Green Bay, WI 54301
Telephone: (920) 884-1066
E-Mail: Tim.Funnell@usdoj.gov
        Daniel.Humble@usdoj.gov

23