UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

        *v.*                            Case No. 25-cr-103

RYAN SCHROEDER,

        *Defendant.*

---

## DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

---

Please take notice that Ryan Schroeder, by his attorney Jason D. Luczak of Gimbel, Reilly, Guerin & Brown LLP, hereby supplements prior arguments based on evidence adduced at the motion hearing on October 20, 2025, before this Court, the Honorable Byron B. Conway, for an order suppressing the use of all evidence obtained through illegally obtained statements, oral or written, allegedly made by Mr. Schroeder to law enforcement officers or any other governmental officials or their agents, and any evidence derived from those statements.

Mr. Schroeder reasserts and alleges that the statements were obtained in violation of the rights guaranteed him under the 4th, 5th, 6th, and 14th Amendments to the United States Constitution. *Harris v. New York,* 401 U.S. 222 (1971); *Terry v. Ohio,* 392 U.S. 1 (1968); *Miranda v. Arizona*, 384 U.S. 436 (1966); *Lynumn v. Illinois,* 372 U.S. 528 (1963); *Mapp v.*

1

*Ohio,* 367 U.S. 643 (1961); *Trupiano v. United States*, 334 U.S. 699 (1948); *Brown v. Mississippi*, 297 U.S. 278 (1936); *Weeks v. United States*, 232 U.S. 283 (1914).

Additionally, Mr. Schroeder moves for exclusion from use as evidence all derivative evidence, otherwise known as "fruit from the poisonous tree including the search warrants obtained using the illegally seized information." *Taylor v. Alabama*, 457 U.S. 687 (1982); *Dunaway v. New York*, 442 U.S. 200 (1979); *Brown v. Illinois*, 422 U.S. 590 (1975); *Davis v. Mississippi*, 394 U.S. 721 (1969); *Wong Sun v. United States*, 371 U.S. 471 (1963); *Silverthorne v. United States*, 251 U.S. 385 (1920).

## SUPPLEMENTAL STATEMENT OF RELEVANT ADDUCED FACTS

*Motion Hearing—Detective Brooks*

On October 20, 2025, this Court held a hearing on the merits of Mr. Schroeder's motion to suppress statements and evidence (Doc. 11) and took testimony from the individuals involved. (Doc. 18). Detective Brooks testified that he began his investigation into Mr. Schroeder with an interview of G.K., a thirteen-year-old seventh grade student with whom Mr. Schroder had allegedly been communicating. (*Id.* at 11-17). Detective Brooks learned that Mr. Schroeder was going to be suspended and put on administrative leave effective 3:00 P.M. that day, April 16, 2025. (*Id.* at 14). Due to the progress of the investigation, Detective Brooks called Lieutenant Brett Oswald and Assistant District Attorney Scarpelli regarding the allegations. (*Id.* at 14-15).

After reaching a stopping point in the interview with G.K., Detective Brooks joined Detective Steber, and they began interrogating Mr. Schroeder. (*Id.* at 18-20). Detective Brooks confirmed that throughout Mr. Schroeder's interrogation, he was feeding

2

information to Lieutenant Oswald, who was applying for a warrant to search Mr. Schroeder's home. (*Id.* at 20). Detective Brooks confirmed that they had taken Mr. Schroeder's phone without a warrant and intended to use the search warrant for the house to justify a warrant for the phone. (*Id.* at 21).

Detectives Brooks confirmed that Detective Steber obtained the passcodes to Mr. Schroeder's phone and Snapchat account, as well as the alleged location of alleged CSAM on his phone. (*Id.* at 23-25). Detective Steber requested that Detective Brooks stay in the conference with Mr. Schroeder throughout this time. (*Id.* at 25). Even though Mr. Schroeder was not to be left alone, Detective Brooks testified that Mr. Schroeder was not detained nor was he under arrest, and that ADA Scarpelli instructed him that Schroeder was not to be taken into custody until after G.K.'s forensic interview was completed. (*Id.* at 25-27, 29-30).

Detective Brooks denied that Detective Steber's interrogation of Mr. Schroeder was aggressive, and alleged that his immediate demands to hand over his phone, iWatch, and any other electronics, in addition to his pointed questions and remarks like "we got to talk," "what would prompt you talking to a detective at the sheriff's office and Mr. Brooks with Mishicot P.D.," and "I think you do know," were not seeking to incriminate Mr. Schroeder. (*Id.* at 31, 33-36). Detective Brooks confirmed that the goal of their interrogation was to elicit incriminating information as they were investigating Mr. Schroeder for child enticement, and he sought assistance from Lieutenant Oswald. (*Id.* at 36-40).

Regarding whether Mr. Schroeder was free to leave, Detective Brooks stated that they had sufficient probable cause to seize Mr. Schroeder's phone but not to take him into custody. (*Id.* at 31). Detective Brooks further confirmed that Mr. Schroeder was arrested anyway, and that during this entire interrogation – wherein both he and Detective Steber were visibly armed - that Mr. Schroeder was never left alone. (*Id.* at 31-33). Despite the information allegedly learned during G.K.'s interview, Detective Brooks testified that Mr. Schroeder would still have been free to walk away. (*Id.* at 33-34). Detective Brooks further confirmed that at no point during the interrogation was Mr. Schroeder told he had a right not to talk to them. (*Id.* at 35).

*Motion Hearing—Detective Steber*

During his testimony, Detective Steber confirmed that Detective Brooks was the primary investigator prior to his involvement but that he was present for a substantial portion of the investigation with G.K. (*Id.* at 57-59). Detective Steber confirmed that he was the one who requested that Mr. Erlandson escort Mr. Schroeder to a place where he could be questioned, that Mr. Schroeder was in the conference room when he arrived, and upon meeting him, he immediately instructed Mr. Schroeder to turn over his phone. (*Id.* at 59-61). Detective Steber stated that he was not asking for permission when he told Mr. Schroeder to give him his phone, and that it was going to happen "regardless." (*Id.* at 83).

4

Detective Steber further explained that he opened Mr. Schroeder's phone using the passcode he elicited from Mr. Schroeder and placed it into airplane mode. (*Id.* at 66-69). Detective Steber continued to press Mr. Schroeder with questions regarding the location of any alleged CSAM and procured the passcode for his Snapchat account and continued to press Mr. Schroeder to disclose the location of any files on the phone. (*Id.* at 69-70). Only after a significant amount of time passed, and Mr. Schroeder had been questioned for a second time in a then-*Mirandized* interview, did Detective Steber confirm that he obtained written consent from Mr. Schroeder to search his phone. (*Id.* at 70-71, 76-82).

Detective Steber confirmed that he had instructed Detective Brooks to remain with Mr. Schroeder while he called Lieutenant Oswald and discussed further investigative strategies to question Mr. Schroeder, as well as the instructions of the District Attorney's Office. (*Id.* at 71-73, 96-99). In fact, the District Attorney's Office instructed Detective Steber not to place Mr. Schroeder under arrest until after the CAC evaluation had taken place. (*Id.* at 73). Detective Steber testified that only when marked sheriff's department vehicles arrived at the school to transport Mr. Schroeder was he formally in custody. (*Id.* at 73-75).

Detective Steber testified he "simply was having a conversation with [Mr. Schroeder]," and made the choice not to arrest him or advise him of his rights at that time as he just wanted to "do a thorough initial interview." (*Id.* at 86). Though not the "norm" Detective Steber felt that it was "pressing" based on the "time crunch" to obtain incriminating information. (*Id.* at 86).

Detective Steber testified that he intentionally used special interrogation tactics from the onset of the interrogation though he did not intend to arrest Mr. Schroeder. (*Id.* at 64-65, 82-83). These tactics included rapport building, which Detective Steber admitted was used to elicit incriminating information that individuals are otherwise reluctant to give. (*Id.* at 82, 85-86).

Other strategies Detective Steber admitted to using were guiding Mr. Schroeder through the interrogation by providing Mr. Schroeder with advice on cooperating to ensure he continued to incriminate himself, reinforcement of behavior to continually compel incriminating remarks by telling Mr. Schroeder that the outcome of the situation depended on his cooperation, and deception, or lying to Mr. Schroeder to continue to elicit that incriminating information. (*Id.* at 87-89). Based on his training and experience, obtaining a confession, apparently by whatever means, can later lead to a waiver of *Miranda* rights. (*Id.* at 89). Here, by the time he decided to provide Mr. Schroeder with his *Miranda* rights, Detective Steber confirmed that "[Mr. Schroeder] gave [him] a good summary." (*Id.* at 89).

Detective Steber confirmed that Mr. Schroeder was the only suspect and target of the investigation. (*Id.* at 91). As the lead investigator, Detective Steber confirmed he was responsible for drafting the warrants in the case and admitted that the only information used in the warrant application to search Mr. Schroeder's phone were the statements elicited from the two interrogations. (*Id.* at 92-95).

6

# ARGUMENT

**I.** **Mr. Schroeder's Fifth Amendment rights were violated when law enforcement failed to advise him of his *Miranda* rights prior to subjecting him to prolonged custodial interrogation and through continued use of coercive pressure and deceptive tactics to elicit an involuntary confession and incriminating information.**

The Fifth Amendment of the United States Constitution and Article I, Section 8 of the Wisconsin Constitution protect any citizen from becoming a witness against themselves, *i.e.*, being compelled to produce self-incriminating testimony, in a criminal matter. U.S. CONST. AMEND. V; WIS. CONST. ART. I, SEC. 8.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court ruled that in a custodial interrogation setting, law enforcement officers must sufficiently warn an individual of their Fifth Amendment privilege against self-incrimination. If no such warnings occur, the statements are inadmissible. *Id.* at 492. However, *Miranda* warnings are not required merely because the person being questioned is a suspect or the focus of a criminal investigation. *United States v. Barker,* 467 F.3d 625, 628 (7th Cir. 2006).

*Miranda* safeguards come into play whenever a person "in custody" is subjected to either express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Berkemer,* 468 U.S. at 428, 104 S.Ct. 3138; *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. A person is "in custody" for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest. *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2402 (2011); *United States v. Podhorn,* 549 F.3d 552, 556 (7th Cir. 2008). This inquiry is an objective one, as neither the subjective views of the suspect being questioned nor that of the officer engaging in the questioning

7

is considered. *Yarborough v. Alvarado,* 541 U.S. 652, 663 (2004); *United States v. Ambrose,* 668 F.3d 943, 954 (7th Circ. 2011).

Determining whether a person was "in custody" for *Miranda* requires addressing two critical inquiries, determining: (1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. *Ambrose*, 668 F.3d at 954-955; *J.D.B.,* 131 S.Ct. at 2402; *Podhorn,* 549 F.3d at 556. The government has the burden of demonstrating a valid waiver of the defendant's waiver of *Miranda* rights and the voluntariness of the confession by a preponderance of the evidence. *United States v. Stewart,* 536 F.3d 714, 722 (7th Cir.2008).

As supplemented from his prior motion to suppress (Doc. 11), Mr. Schroeder was unquestionably in custody when Detective Steber began interrogating him at the Mishicot High School, and the decision not to advise him of his *Miranda* rights prior to questioning demands this court suppress his alleged statements.

A. **Mr. Schroeder was in custody for the purposes of *Miranda* at the time of the initial interview, and the circumstances around his questioning clearly demonstrate that law enforcement was required to advise him of his rights.**

Interrogation that would trigger the *Miranda* requirements includes questioning by the officers or any words or actions that the officers know or should know are reasonably likely to elicit an incriminating response. *United States v. Swanson,* 635 F.3d 995, 1001-02 (7th Cir. 2011); *United States v. Richardson,* 657 F.3d 521, 525 (7th Cir. 2011). A statement is voluntary only if, in light of the totality of the circumstances, it is the product

of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that overcome the defendant's free will. *Richardson,* 657 F.3d at 525. Coercive police activity is a necessary predicate to determining that a confession is involuntary. *Richardson,* 657 F.3d at 525.

For *Miranda* purposes, "interrogation" means the express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Whether an interrogation occurred is determined by a test that is both objective and subjective in nature. *Id.* at 302, n. 7. Meaning, the critical analysis focuses on whether an objective observer could conclude that the officer's conduct or words would be likely to elicit an incriminating response. *Id*. at 301. The subjective nature remains on whether the officer "*should have known"* were reasonably likely to elicit an incriminating response. *Id.* at 302. (emphasis in original).

Reaching the question of whether an interrogation occurred, factors that courts are to consider include non-exhaustive areas of whether:

(1) the encounter occurred in a public place;

(2) the suspect consented to speak to the officers;

(3) the officers informed the individual that he was not under arrest;

(4) the individuals were moved to another area;

(5) there was a threatening presence of several officers and a display of weapons or physical force;

(6) the officers deprived the suspect of documents needed to depart; and

(7) the officers' tone of voice was such that their requests would likely be obeyed.

*Barker,* 467 F.3d at 629.

9

Here, an objective observer would conclude that the words and conduct of the officer would likely elicit an incriminating response. Mr. Schroeder was ripped away from his job and directed into a closed conference room in which law enforcement immediately assertively informed him that they needed to talk. (Ex. 1001 at 0:00:18-0:00:30). Mere seconds into the exchange, Mr. Schroeder was instructed that law enforcement was confiscating his electronics. (*Id.* at 0:00:30-0:00:55). Nowhere in his tone of voice, the questions he used, or law enforcement's direction of force by using the school superintendent - Mr. Schroeder's boss - to direct Mr. Schroeder to remain in the conference room to await law enforcement's arrival, is there any indication that the circumstances of the exchange were anything less than an interrogation.

The focus of Detective Steber's arranged meeting was unquestionably not to convey information to Mr. Schroeder. This was systematic interrogation for *Miranda* purposes because Detective Steber should have known that confronting Mr. Schroeder with evidence of his guilt was likely to elicit an incriminating response, and the government cannot argue otherwise. *Ambrose*, 668 F.3d at 954-956. This is especially true after he closed them in a room and told Mr. Schroeder in no uncertain terms that he needed to comply and speak with him and sought to incriminate Mr. Schroeder without advising him of his rights. Likewise, Detective Steber demanded Mr. Schroeder's phone and iWatch, and even testified that he was going to get it "regardless."

Detective Steber characterized the interrogation as amenable, contrary to the tone of his voice revealed in the audio recording. (*compare* Ex. 1001 at 0:00:18-0:00:55) and (Doc. 18 at 62, 63-64). The words and actions of law enforcement demonstrate an objective

10

understanding that their subjective intent was to elicit incriminating statements from Mr. Schroeder. *Innis*, 446 U.S. at 301. This is further evidence by the clearly assertive, aggressive, and demanding tone and intimidating physical posture Detective Steber assumed, which confirmed that this was not a situation where Mr. Schroeder had any room for choice or error.

Both Detectives Steber and Brooks argued that they had probable cause to seize Mr. Schroeder's phone and iWatch immediately upon questioning him, but not to take him into custody. (Doc. 18 at 31, 83-85). This argument runs contrary to decades of constitutional understanding and demonstrates an intentional effort by law enforcement to *post hoc* justify their conduct. If the investigative procedure is a search requiring probable cause, the initial seizure of person or property "no matter how brief," cannot not be justified on less than probable cause. *United States v. Place*, 462 U.S. 696, 706, 103 S. Ct. 2637, 2644, 77 L. Ed. 2d 110 (1983) (citing *Terry v. Ohio,* 392 U.S., at 20, 88 S.Ct., at 1879; *United States v. Cortez,* 449 U.S. 411, 421, 101 S.Ct. 690, 697, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Simply put, if police have not established probable cause to arrest, they have not established probable cause to justify the property's seizure. *Lee v. City of Chicago*, 330 F.3d 456, 464 (7th Cir. 2003).

Probable cause for an arrest exists if "an officer reasonably believes, in light of the facts and circumstances within his knowledge at the time of the arrest, that the suspect has committed, or is committing, an offense." *Thompson v. Wagner*, 319 F.3d 931, 934 (7th

11

Cir. 2003). There is no authority for the principle that the police can engage in seizures without probable cause simply because to do so enhances their ability to conduct investigations which may eventually lead to probable cause. *See Davis v. Mississippi*, 394 U.S. 721, 726–727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676.

Though both Detectives Steber and Brooks testified that Mr. Schroeder was free to leave, their testimony was blatantly incredible. Mr. Schroeder's phone and iWatch were immediately seized, at no point did law enforcement leave Mr. Schroeder alone, and Detective Steber testified that he instructed Detective Brooks to remain with him in his absence. (*Id.* at 71-73). Detective Brooks further confirmed the testimony of Detective Steber that they were instructed not to arrest Mr. Schroeder based on orders from the Manitowoc District Attorney's Office, particularly those of ADA Scarpelli. (*Id.* at 25-27, 29-30, 71-73, 96-99). Simply because the Manitowoc District Attorney's Office and ADA Scarpelli instructed them not to formally place Mr. Schroeder under arrest does not mean he was not in custody, or that they are relieved of the obligation to advise him of his *Miranda* rights.

Both detectives knew that Mr. Schroeder was their only suspect, they knew of G.K.'s allegations, the goal of their interrogation was to elicit incriminating information, they were investigating him for child enticement, and had probable cause to seize and search Mr. Schroeder's phone, but both boldly assert that he was still free to leave at any point (though he was notably not informed of such an option). (*Id.* at 31, 36-40, 83-85, 87-89). These actions by law enforcement clearly demonstrate an intent and concerted effort to elicit incriminating information and circumvent fundamental constitutional

protections under *Miranda*. Once a person is determined to be in custody, the second inquiry considers whether Mr. Schroeder was subjected to interrogation.

**B. Law enforcement's actions demonstrate that no objective person would have remained free to leave when they began questioning Mr. Schroeder.**

To establish whether an individual was in custody at the time of their questioning they must show they were subjected to formal arrest, or restraints of freedom "closely approximated or actually attained." *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990); *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016). Determining whether a person would have felt free to leave is an objective test of whether a reasonable person under the same circumstances as Patterson would have felt free to leave. *Yarborough v. Alvarado*, 541 U.S. 652, 662–63 (2004); *United States v. Snodgrass,* 635 F.3d 324, 327 (7th Cir.2011) (Fifth Amendment); *United States v. Mendenhall,* 446 U.S. 544, 553 (1980) (Fourth Amendment).

In determining whether a reasonable person in the accused's shoes would have felt free to leave, courts consider "all of the circumstances surrounding the interrogation." *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012). Assessing the circumstances, courts consider:

1. the location of the interrogation
2. the duration of the interrogation
3. any statements made by the suspect during the interrogation
4. any use of physical restraints during the interrogation
5. whether the suspect was released at the end of the interrogation.

*See Id.* at 1189.

The first words exchanged between Mr. Schroeder and Detective Steber upon meeting were a demand by Detective Steber, followed by the closing of a door in a small conference room. (Ex. 1001 at 0:00:18-0:00:30). Mr. Schroeder was an unwitting participant in this whole endeavor. Mr. Schroeder was brought into conference room and instructed to remain there by his boss, essentially ordered to report to the meeting as part of his job. Whenever Mr. Schroeder hesitated to continue answering questions or paused to think, Detective Steber pressed on and continued the questioning, telling Mr. Schroeder that his "best angle at this point is to continue and keep it up." (*Id.* at 00:07:17-00:07:26).

During the entire interview, at no point was Mr. Schroeder left alone. (Doc. 18 at 71-73). Law enforcement was either actively interrogating him, flanking the door, or taking turns watching him. (*See generally* Exs. 1000 - 1005). Detective Steber *admitted* that he used *four* types of interrogative tactics: rapport building, guiding, reinforcement, and deception. (Doc. 18 at 82-83, 87-89). Each of these were used to elicit incriminating information from Mr. Schroeder, and the sole purpose of the interrogation in the first place was to elicit incriminating information. (*Id.* at 65-66, 87-88). The assertion from Detective Steber that Mr. Schroeder was only in custody once marked sheriff's department vehicles arrived (*Id.* at 73-75) is without any consideration of the intentional subversions, pressures, tactics, and efforts that he and Brooks had undertaken to elicit incriminating information from Mr. Schroeder without advising him of his *Miranda* rights.

These actions took place throughout his time in custody both at the high school as well as at the police department after law enforcement placed him in handcuffs and transported him. At no point would an objective observer have believed that they remained free to leave. For law enforcement to assert that they would have let Mr. Schroeder walk free when he was alleged to have committed the offenses suspected, as well as having already seized his property on the basis of sufficient probable cause, is a preposterous distortion of common sense used to justify their actions and intentional subversion of Mr. Schroeder's constitutional rights.

The facts before this court support that, to any reasonable person, Mr. Schroeder was in custody throughout this entire exchange, and he was to be advised of his *Miranda* rights prior to being subjected to rigorous questioning by law enforcement.

**C. Law enforcement's decision to advise Mr. Schroeder of his *Miranda* rights after subjecting him to prolonged questioning, searching his phone and Snapchat account, and transporting him to a room for questioning at the Manitowoc County Sheriff's Department demonstrates a deliberate and intentional effort to avoid providing him with knowledge of his constitutional rights.**

It is a bedrock understanding that an involuntary confession is a violation of due process rights under the U.S. Constitution. *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). Courts disfavor tactics used to subvert those protections and a "ruse entry, by its very nature, runs contra to the concept of an intelligent consent or waiver." *See United States v. Phillips*, 497 F.2d 1131, 1135 n.4 (9th Cir. 1974).

The deceptive tactics and methods used by law enforcement render any statements offered by Mr. Schroeder involuntary. *Richardson*, 657 F.3d at 525. Only after

15

receiving incriminating statements, being transported to the police department, and being questioned for extensive periods of time, did Detective Steber advise Mr. Schroeder of his *Miranda* rights—conveniently only after incriminating statements were made and he was placed in handcuffs and transported off school grounds for continued interrogation.

Law enforcement, again, used *four* types of interrogation to ensure that Mr. Schroeder incriminated himself. (Doc. 18 at 82-83, 87-89). Doing so, with their sole justification of the questioning to incriminate him (*Id.* at 65-66, 87-88), law enforcement intended to side-step Mr. Schroeder's constitutional rights. Further, law enforcement's justification for doing so was a scripted response to assert that either (1) Mr. Schroeder was not in custody and free to leave, and (2) the alternative that they were instructed by the Manitowoc District Attorney's Office not to arrest him. (*Id.* at 31, 33-34, 73, 85). Both are equally absurd. At no point is it believable that Mr. Schroeder would have been free to walk away from this encounter after law enforcement knew he was suspected of child enticement, they seized his phone and iWatch, and further developed a strategy alongside their superiors and attorneys at the Manitowoc District Attorney's Office. (*Id.* at 36-40, 62-63, 65-66, 71-73, 96-99).

Law enforcement took the same approach to questioning Mr. Schroeder in violation of *Seibert*, and both sets of Mr. Schroeder's statements should be suppressed along with any evidence derived from those illegally obtained statements. These actions taken by law enforcement are directly prohibited under *Missouri v. Seibert*, 542 U.S. 600 (2004), for the proposition that it is impermissible for police to withhold *Miranda*

16

warnings until after questioning a suspect. There, police intentionally withheld *Miranda* warnings and conducted a custodial interrogation of *Seibert*. *Id*. at 604-05. After Seibert made incriminating statements, police gave Seibert her *Miranda* warnings and conducted a repeated interrogation. *Id*. at 605. The court found that Seibert's post-*Miranda* statements were inadmissible because, on these facts, the warnings did not serve the purpose of *Miranda*. *Id*. at 617.

*Siebert* stands for the constitutional demands that *Miranda* warnings, "inserted in the midst of coordinated and continuing interrogation, … are likely to mislead and 'deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id.* at 613 (quoting *Moran v. Burbine*, 475 U.S. 412, 424, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986)).

Mr. Schroeder would not have spoken with law enforcement, nor would he have done so after being read his rights had he been advised of his *Miranda* rights at the beginning. Seeing no other way out, Mr. Schroeder relied upon the continued direction and assertions from law enforcement to cooperate and answer their questions. This tactic was intentional and coercive.

The actions of law enforcement demonstrate a disregard for Mr. Schroeder's constitutional rights. The compelled nature of his statements is clear, and the actions of law enforcement to later *Mirandize* him as a *post hoc* cure to their actions articulates a clear subversion of constitutional protections and demands broad suppression.

17

**II. The unconstitutional search of Mr. Schroeder's cell phone without a warrant demands suppression, as the use of information discovered during the warrantless search for continued un-*Mirandized* questioning in addition to the deception and coercive pressure by law enforcement to search his cellphone are fruits of the poisonous tree, and cannot be purged of taint and the exclusionary rule demands suppression.**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and that "no Warrants shall issue, but upon probable cause[.]" U.S. CONST. amend. IV.

A search or seizure conducted without a valid warrant is presumptively unreasonable. *United States v. Ross,* 456 U.S. 798, 824-25, (1982). A particular warrant also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his [or her] need to search, and the limits of his [or her] power to search." *Groh v. Ramirez*, 540 U.S. 551, 561 (2004). Of which, it has long been held that a warrant is required to search the contents of a cellphone. *Riley v. California*, 573 U.S. 373, 403, (2014).

**A. Law enforcement acted with intentional disregard when they searched Mr. Schroeder's phone without a warrant and later used the information learned in that warrantless search to direct their un-*Mirandized* interrogation, which led directly to their subsequent efforts in obtaining consent to search.**

The Fourth Amendment's probable cause and warrant requirements do not apply where an authorized party voluntarily consents to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, (1973). Ostensibly, a search warrant is not required when law enforcement searches a cell phone following the owner's consent. *See United States v. Thurman,* 889 F.3d

18

356, 366 & n.9 (7th Cir. 2018). As such, in determining whether a statement or confession was voluntary, courts must examine the record and apply the totality of circumstances test. *See Arizona v. Fulminante,* 499 U.S. 279, 286–87 (1991).

In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possible vulnerable subjective state of the person who consents. *Bustamonte,* 412 U.S. at 229. Relevant factors include (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent. *United States v. Strache,* 202 F.3d 980, 985 (7th Cir.2000).

Other factors this court can consider are whether *Miranda* warnings were given prior to the search, and whether the defendant was told they had a right to withhold their consent to the search. *United States v. Kim,* 25 F.3d 1426, 1431 (9th Cir.1994). However, no single factor is dispositive. *United States v. Chaidez,* 906 F.2d 377 (8th Cir.1990). The government bears the burden of proving, by a preponderance of the evidence, that consent was freely and voluntarily given. *U.S. v. Raibley*, 243 F.3d 1069 (7th Circ. 2001).

Further, analyzing whether consent is valid despite unlawful police conduct, courts consider (1) the time elapsed between the illegal conduct and the discovery of the evidence; (2) the existence of intervening circumstances; and (3) the nature of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Law enforcement used clear deception and strong-arm tactics that intimidated Mr. Schroeder, and only then was his clearly coerced consent obtained. From demands to surrender his belongings, to the multiple modes of interrogative methods used to coerce incriminating information without regard for his rights, law enforcement undermined each fundamental consideration of what a voluntary offering of consent is built upon. Along with concerted efforts to side-step constitutional protections, equally important to the voluntariness analysis is the fact that Mr. Schroeder was not informed of his right to withhold consent to search, particularly after they demanded his passwords and already searched his phone without a warrant. *See Schneckloth*, 412 U.S. at 248–49 (subject's knowledge of a right to refuse is a factor to be taken into account).

Instead of initially seeking his consent, Detective Steber decided to search through Mr. Schroeder's phone. (Doc. 18 at 66-69). Detective Steber then directed his interrogation using the information he had illegally obtained and further avoided advising Mr. Schroeder of his rights, and only then did law enforcement obtain his written consent to search the contents of the phone. (*Id.* at 70-71, 76-82). It is unquestionable that Mr. Schroeder would not have given his consent to search his phone had he been advised of his right to refuse and would have required law enforcement to obtain a warrant to search it.

Law enforcement has known for over a decade that a warrant is required to access the intimate details within Mr. Schroeder's phone. *Riley*, 573 U.S at 403. Illustrated against the backdrop of the actions undertaken at the time of the warrant, the totality of the circumstances demonstrates a deliberate and coordinated effort by law enforcement to

20

subvert constitutional rights and dupe Mr. Schroeder into believing he was not in custody and to waive his rights as well as grant them access to areas they had already searched to cover their tracks. Law enforcement's actions were wholly intentional, and the tactics used were to intentionally elicit consent to search his phone. As such, their actions in obtaining consent to search from Mr. Schroeder are blatantly unconstitutional and demand suppression.

**B. Law enforcement's use of compelled statements during custodial interrogation of Mr. Schroeder without advising him of his rights and later including them as the sole basis for the application of search warrant for his phone demands suppression.**

A warrant must be supported by probable cause, an oath, and particularity. *United States v. Castetter*, 865 F.3d 977, 978 (7th Cir. 2017). These requirements are typically satisfied through an officer's warrant affidavit. *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013).

To decide whether evidence obtained by a warrant is an independent legal source, two thresholds must be determined: first, did the illegally obtained evidence affect the magistrate's decision to issue the warrant? And second, did the illegally obtained evidence affect the government's decision to apply for the warrant? *Murray v. United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

On the first question, two cases control, *United States v. Markling,* 7 F.3d 1309 (7th Cir. 1993) and *United States v. Etchin,* 614 F.3d 726, 733 (7th Cir. 2010). In *Markling*, Police intercepted the motel staff transporting private belongings and illegally searched a

21

briefcase in the motel hallway, found drug paraphernalia inside, and referenced that discovery in the warrant application to search his motel room. *Markling*, 7 F.3d at 1311. In *Etchin*, police illegally entered the defendant's apartment, then applied for a search warrant and mentioned evidence obtained during the illegal entry in the warrant application. *Etchin*, 614 F.3d at 737. The tainted evidence referenced was the floor plan, however, and did not mention the contents or evidence uncovered in plain view. *Id.* at 737-738.

Thus, the first consideration is to determine whether the inclusion of tainted evidence in the warrant application affected the magistrate's decision to issue a search warrant, courts must evaluate whether the warrant application contained sufficient evidence of probable cause without the references to tainted evidence. *United States v. Huskisson*, 926 F.3d 369, 375 (7th Cir. 2019).

Thereafter, the second consideration is whether the illegal activity affected the decision to apply for a warrant. *Huskisson*, 926 F.3d at 376. In this case, the court must conclude that the evidence contained within the search warrant for Mr. Schroeder's phone tainted the entirety of the fruits obtained. Detective Steber confirmed he was responsible for drafting the warrants in the case and admitted that the only information used in the warrant application to search Mr. Schroeder's phone were the statements elicited from the two interrogations. (*Id.* at 92-95). Likewise, the entire effort between Detectives Steber and Brooks, as well as ADA Scarpelli and Lieutenant Oswald, was to continue to question Mr. Schroeder to obtain additional information for the warrant to

his home, while continuing to explore potentially incriminating areas through repeated questioning.

It is without a doubt that the warrants for Mr. Schroeder's phone (Motion Hearing Ex. 101) are tainted, and upon excising the only information included in the affidavit being the illegally obtained statements, that the warrants fail on their face without any probable cause to be found.

**C. To meaningfully deter law enforcement from continuing this intentional behavior of subverting constitutional protections the exclusionary rules must apply and suppress the poisoned fruits of their search.**

The Supreme Court has long recognized the need to exclude evidence obtained in violation of the Constitution's protections. *See Weeks v. United States,* 232 U.S. 383, 398 (1914). Exclusion will run not only to the unconstitutionally obtained evidence, but also to the fruits of that evidence—the so-called fruit of the poisonous tree. *United States v. Conrad,* 673 F.3d 728, 732 (7th Cir. 2012).

When the government obtains evidence in violation of the Fourth Amendment, the primary purpose of the exclusionary rule "is to deter future unlawful police conduct." *United States v. Calandra,* 414 U.S. 338, 347 (1974). The exclusionary rule is premised on suppressing evidence that "is *in some sense* the product of illegal governmental activity." *Nix v. Williams,* 467 U.S. 431, 444 (1984) (emphasis in original). This rule applies unless the government shows sufficient attenuation from the illegality to dissipate the "taint." *Murray v. United States*, 487 U.S. 533, 536-37 (1988). However, the

23

application of the exclusionary rule must be weighed against the social costs and requires a balancing of relevant public interests. *Illinois v. Krull,* 480 U.S. 340, 352-53 (1987).

The exclusionary rule applies to both tangible and intangible evidence and also excludes derivative evidence under certain circumstances, via the fruit of the poisonous tree doctrine, if such evidence is obtained "by exploitation of that illegality." *Wong Sun,* 371 U.S. at 485-88. The scope of this remedy is to prevent the State from "profit[ing] from its illegal activity." *Murray,* 487 U.S. at 542. The rule excludes the unlawfully obtained evidence to "meaningfully deter" police misconduct such that interfering with the criminal justice system's truth-seeking objective is justified. *Herring v. United States*, 555 U.S. 135, 144 (2009).

Police misconduct is sufficiently deliberate and can be effectively deterred through the exclusion of evidence where the conduct is "deliberate, reckless, or grossly negligent," or, in some circumstances, where the conduct involves "recurring or systemic negligence." *Id.* In contrast, police misconduct is not sufficiently deliberate "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence." *United States v. Leon,* 468 U.S. 897, 918 (1984).

If the consent to search results from an independent act of free will, *see United States v. Pedroza,* 269 F.3d 821, 827 (7th Cir. 2001), or is sufficiently attenuated from the illegal police activity, *see United States v. Jerez,* 108 F.3d 684, 694-95 (7th Cir.1997), the taint is "purged" and the consent is valid. *Wong Sun* not only requires that the statement meet

24

the Fifth Amendment standard of voluntariness, but it must also be sufficiently an act of free will to purge the primary taint. *Brown,* 422 U.S. at 602.

The concern in attenuation cases is whether the connection between the illegal police activity and a later statement has become so attenuated as to dissipate the taint. *See Id.* If a defendant's statement and consent to search were obtained by exploitation of prior illegal police activity, then any statements and evidence obtained during a search must be excluded. *See Id.* at 603; *Wong Sun*, 371 U.S. at 488.

The demeanor of Detectives Steber and Brooks alone should serve as proof of their intent to subvert Mr. Schroeder's constitutional rights.[1] Fundamentally, Detective Steber testified that in seeking to take Mr. Schroeder's phone, it was going to happen "regardless." (Doc. 18 at 3). Detective Steber's candor regarding the events demonstrates that regardless of Mr. Schroeder's rights, he was going to seek incriminating information by whatever means were at his disposal. At each step, instead of advising Mr. Schroeder of his rights, due to the "pressing" nature of the allegations, the goal was to elicit incriminating information because they were simply under a "time crunch." (*Id.* at 36-40, 86). Justification for the violations of Mr. Schroeder's rights could be figured out later. Mr. Schroeder's rights do not simply cede based on a "time crunch" or a justification that the information would be obtained "regardless." As a measure to meaningfully deter

---

[1] Likewise, the independent source doctrine recognizes that the goal of the exclusionary rule is to put "the police in the same, not a worse, position than they would have been in if no police error had occurred." *Nix*, 467 U.S. at 443; *Huskisson*, 926 F.3d 369, 374 (7th Cir. 2019). There is no meaningful argument that can be made from the Government that the independent source doctrine saves the actions of law enforcement here, the actions of Detectives Steber and Brooks are a clear intentional decision to subvert Mr. Schroeder's constitutional rights in the aspirations to obtain incriminating remarks in the face of a time crunch.

25

law enforcement, the good faith doctrine does not save their actions, and the exclusionary rule must apply.

Here, all of the fruits relating to R.M. are poisoned: from Mr. Schroeder's alleged confessions to the warrantless search of his phone and later coerced consent to search, to the following interviews. Additionally, it is undisputed that law enforcement confirmed that they would have had no knowledge of R.M. had they properly advised Mr. Schroeder of his constitutional rights. (*See generally* Doc. 18). Ultimately, R.M.'s forensic interviews are a direct byproduct of egregious violations of Mr. Schroeder's rights. There is no attenuation, and there is no cure. The order of events clearly demonstrates that law enforcement ignored constitutional protections and Mr. Schroeder's constitutional rights for the convenience of a fruitful interrogation.

Any objectively reasonable officer would have understood the necessity of either consent or a warrant before opening and searching through Mr. Schroeder's phone and Snapchat account. Detective Steber did not have any knowledge regarding the allegations associated with R.M. prior to his violation of Mr. Schroeder's *Miranda* rights and subsequent unconstitutional search of his phone and Snapchat account. To uphold these actions would allow law enforcement to subvert constitutional protections that require them to obtain consent before searching, or wait for a warrant as required under *Riley*, 573 U.S at 403.

Further, any warrant obtained in this matter relied solely on the statements obtained in violation of Mr. Schroeder's constitutional rights. Detective Steber admitted that the only information used in the warrant application to search Mr. Schroeder's phone

26

were the statements elicited in his series of interrogations. (*Id*. at 92-95). Therefore, the evidence obtained from those warrants is tainted and should be suppressed.

Where the use of illegally obtained evidence is the basis of continued investigative efforts of law enforcement and subsequent fruits are obtained as a result of those efforts, the taint cannot be purged from the entirety of the investigation. To hold otherwise would clearly and unlawfully allow law enforcement to "profit from its illegal activity." *Murry*, 487 U.S. 542. In addition, the benefit of suppression outweighs the societal cost of excluding evidence obtained from law enforcement's unlawful search in this case.

**CONCLUSION**

For the reasons stated above, Mr. Schroeder respectfully requests that this Court grant his motion to suppress his statements to police, any fruits from the post-*Miranda* interrogation, and all evidence derived from the illegal search and seizure, including any evidence obtained from warrants based solely on those un-*Mirandized* statements. Mr. Schroeder further reserves the right to further supplement his arguments.

Dated this 20th day of November, 2025.

Respectfully submitted,

GIMBEL, REILLY, GUERIN & BROWN LLP

By: *Electronically signed by Jason D. Luczak*
JASON D. LUCZAK
State Bar No. 1070883
Email: jluczak@grgblaw.com
Attorney for Defendant

27

POST OFFICE ADDRESS:

330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
Telephone:  414/271-1440

Case 1:25-cr-00103-BBC     Filed 11/20/25     Page 28 of 28     Document 22